IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON, D.C.

| | |
|---|---|
| GODSON M. NNAKA;<br>6430 RICHMOND AVENUE<br>SUITE 300<br>HOUSTON, TX 77057<br><br>   Plaintiff.<br>v.<br><br>FEDERAL REPUBLIC OF NIGERIA;<br>Federal Ministry Of Justice<br>Plot 71B Shehu Shagari Way<br>FCT, Abuja – Nigeria  (West Africa)<br><br><br>ABUBAKAR MALAMI (the attorney general and<br>Federal minister of justice of Nigeria);<br>Federal Ministry Of Justice<br>Plot  71B Shehu Shagari Way<br>FCT, Abuja – Nigeria  (West Africa)<br><br>   Defendants. | Civil Action No. _____<br><br><br><br><br><br><br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

## PLAINTIFF'S COMPLAINT

## AND

## PETITION FOR APPOINTMENT AS PRIVATE ATTORNEYS GENERAL

1. Plaintiff, Godson M. Nnaka ("Plaintiff" or " Nnaka"), by his attorney

Benneth O. Amadi, Esquire, brings this Complaint for unjust enrichment; quantum

meruit; misrepresentation; Libel; breach of contract; breach of implied covenant of good

faith and fair dealing; intentional infliction of emotional distress; wrongful discharge and

abuse of process against the Federal Republic of Nigeria ( "Nigeria" or "1st defendant")

and Mr. Abubakar Malami ("2nd defendant"), the present Nigeria's Attorney General and

Minister of Justice in Nigeria (collectively "defendants."). This case is an offshoot of the case with docket number 1:13-cv-01832 (JDB) in the United States Federal District Court, Washington, D.C.

Plaintiff further brings this Complaint seeking for an equitable Order declaring and/or appointing him and his Counsel, Benneth O. Amadi, Esquire, as Private Attorneys General for the people of Nigeria in matters relating to and having to do with the investigation, tracing, discovery, astute prosecution, good faith recovery, proper accounting and the safe repatriation of the public funds stolen and/or looted from Nigeria and stashed out in different hideouts in the USA and in different other parts of the world.

Plaintiff hereby requests for trial before a Jury and demands for judgment against defendants, jointly and severally, in the amounts set forth in this Complaint and/or to be proved at trial.

## JURISDICTION AND VENUE

2.      The Federal District Court has original jurisdiction over this civil matter. The amount in controversy is over $75,000.00 and plaintiff and defendants do not share the same state citizenship. Plaintiff and defendants are of diverse citizenship. This case is an offshoot of the case with docket number 1:13-cv-01832 (JDB) in which defendants also libeled plaintiff.

3.      Jurisdiction is also proper in this case under 28 U.S.C., Section 1605(a)(2) of the Foreign Sovereign Immunity Act ("FSIA") because this suit is based upon a commercial activity of a foreign state that has substantial connection with the United States; and/or  (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; and/or  (3) upon an act outside the

territory of the United Sates in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

4.      Jurisdiction in this Court is also proper and available against the defendants under the FSIA non-commercial torts exceptions of 28 U.S.C., Section 1605, particularly 28 U.S.C., Section 1605(a)(5)(B) dealing with misrepresentation, slander, libel, and abuse of process exceptions.

## PARTIES

5.      Plaintiff repeats and re-avers all the allegations contained in paragraphs 1 through 4 of this complaint and incorporates them herein.

6.      Plaintiff is an adult citizen of the United States of America of Nigerian descent. Plaintiff's address is 6430 Richmond Ave., Ste. 300, Houston Texas 77057.

7.      First defendant, the Federal Republic of Nigeria, is a foreign State. It is a country located in the Western part of Africa. The two Defendants' address is the Federal Ministry of Justice, Plot 71B Shehu Shagari Way, FCT Abuja, Nigeria.

8.      The second defendant, Abubakar Malami, is the current Attorney General and Minister of Justice of the Federal Republic of Nigeria, the 1st defendant. He is the chief law officer of Nigeria. The 2nd defendant is being sued in his official capacity.

## FACTS COMMON TO ALL THE COUNTS

9.      Plaintiff re-alleges and incorporates paragraphs 1 through 8 herein.

10.     In November of 2004, plaintiff was generally retained, on contingency-fee basis, by the Federal Republic of Nigeria to use his professional services to search for, investigate, discover, recover and repatriate funds that were stolen or looted from the coffers of Federal Republic of Nigeria and stashed out in different banks and hideouts in different countries outside the frontiers of Nigeria.

11.     By virtue of the aforesaid 2004 retainership and contingency-fee agreement, plaintiff was conferred with and has the authority to act for and to represent Nigeria in connection with the looted funds wherever they may be found.

12.     As at November of 2004, when plaintiff was retained by the defendants, plaintiff was a Maryland and District of Columbia licensed and practicing attorney with offices in Baltimore, Maryland, and in Washington D.C, and associate offices in the State of Texas. The plaintiff was also a member of the Bar of the Supreme Court of the United States of America, and also then available to practice law in other jurisdictions in the United States of America.

13.     Pursuant to the aforesaid contingency-fee retainership agreement between plaintiff and the Republic of Nigeria, plaintiff was caused to discover about five hundred and fifty million ($550,000,000.00) dollars stolen, looted and stashed outside Nigeria by a former head of the government of the Federal Republic of Nigeria, the late General Sani Abacha.

14.     At the time Defendant Nigeria commissioned plaintiff Nnaka with the aforesaid retainership, it was understood among the parties that the services requested of Nnaka was expensive, perilous and hazardous, particularly in Nigeria, and plaintiff was given the liberty to reasonably associate and employ whatever strategy and means he deemed appropriate and legal to positively accomplish the result of the agreement.

15. Furthermore, Defendant Nigeria was to cooperate in good faith with plaintiff and provide appropriate security and safety covers as necessary during plaintiff's in-country engagements.

16.     Given the prevalence of corruption in Nigeria and the relative propensity of

4

Nigerian corrupt officials to impede and obstruct corruption investigations or even "kill" or "fight" those hired to fight corruption, plaintiff's services under the retainership was (and still is) considered hazardous and dangerous for which plaintiff was entitled to security protection in Nigeria. Defendants, most of the times, neglected to provide plaintiff with the agreed security cover even as plaintiff made numerous trips back and forth to Nigeria and spent extraordinary amount of time in Nigeria in pursuit of the service leading to discovery of the loots.

17.     For the course of several years during which plaintiff was searching, tracing, investigating, interviewing, collaborating with experts and collating data pursuant to the retainership, he and his associates expended money, time and efforts and suffered numerous calamities within and outside Nigeria, including two assassination attempts by "unknown agents" while in Nigeria.

18.     Pursuant to the aforesaid 2004 contingency-fee Agreement between the plaintiff and the Federal Republic of Nigeria, plaintiff took several responsible, painstaking and sincere steps to accomplish the onerous task of locating and recovering some of Nigeria's stolen and looted funds. Plaintiff made pointed, focused and undiluted efforts toward accomplishing and achieving the aim of the bargain and securing the best results for the Federal Republic of Nigeria. Plaintiff traveled to several countries of the world, contacted some of the best brains and minds in the world, and partnered and used some of the best hands from different continents of the world to accomplish the needed results. Plaintiff also expended money, incurred costs, risks and expenses therefrom.

19.     Among the several reasonable, expensive and painstaking steps employed and taken by the plaintiff in securing the best results for his Agreement with the Federal

Republic of Nigeria were:

a.  Engaging the services William Ruggles, a Connecticut, U.S.A., based Consultant familiar with the intricate world of international money movement;

b.  Associated with Jonathan Schafran, a high profile New York, U.S.A., based lawyer and former high ranking U.S. A. intelligence officer experienced in international affairs and forensic financial investigations who worked closely with his colleagues and foreign counterparts on the matter;

c.  Maintained an advisory relationship with a notable U.S.A. trial attorney, Attorney Gerry Spence and his associates, Ed Moriarty, in Wyoming, U.S.A;

d.  Co-opted the services of Denis Corgil, a former Professor of Law at Widener University School of Law in Harrisburg, PA, U.S.A;

e.  Partnered with Michelle Gouldin, a Paris based Lawyer for support on the European wing of the search and recovery of the looted funds;

f.  Travelled to England, France, Turkey, Austria, Switzerland, Angola and to several other parts of the world pursuing leads, reviewing information and engaging agents towards realizing the objectives and the focus of the Nigeria's instructions and retainership;

g.  Travelled numerous times to and fro Nigeria and opened local coordinating offices in Nigeria;

h.  Facilitated the travel of numerous agents and officials to Nigeria and other parts of the world in relation to this matter;

i.  Met with Mariam Abacha (widow of the late General Sani Abacha) and Alhaji Haruna (a former Attorney General of Kogi State, Lawyer and confidant of the Abacha family) and several other persons;

j.  Met with Abubarkar Atiku Bagudu (late General Abacha's business Associate and the alleged mastermind of the criminal money laundering scheme at issue in this case). Some of the meetings took place in Nigeria, England and France;

k.  The purpose of the meetings with the Abacha family and their agents were to elicit their cooperation and validate information and data gathered by the Firms working in connection with the looted funds;

l.  Retained the professional services of Attorneys Jude Ezeala; Charles Lion Agwumezie; Kenneth Nnaka and the firm of Nnoli, Okoye & Associates to fight against the forfeiture in the U.S.A District Court and ensure the return of the discovered looted $550 million dollars directly and safely to the Nigerian people;

m.  Prepared and filed Intervention and Claim for Nigeria in the forfeiture case in the District of Columbia Federal Court, Docket No. 1:13-cv-01832-JDB;  and

n.  Later filed an Appeal in the United States Appeals Court, D.C. Circuit, Appeal No. 16-5025 to protect the interest of Nigeria and to safeguard the discovered loots for their safe and uncompromised repatriation to Nigerians.

20.  Plaintiff avers that upon the discovery of $550 million of the looted Nigerian funds and after all the herein-above difficult, painstaking and perilous works accomplished by plaintiff, Defendant Nigeria was brought  on the know about it; and upon information and belief, the Federal Republic of Nigeria scorned the finding and unreasonably did nothing to achieve the immediate and quick repatriation of the looted funds to Nigerians.

21.  Upon information and belief, the United States initiated a forfeiture action against the discovered loot under seal in 2013 in the U.S Federal District Court in the District of Columbia. The case number is 1:13-cv-01832 (JDB). In that action, the United States Government prayed the Court to forfeit the discovered funds to the United States against all other interests. The suit was unsealed about March 15, 2014.

22.  Under the Rules of Court, any potential Claimant who claimed interest in the unsealed action had forty five (45) days from the date of the unsealing to file a claim or forfeit the right forever.

23.  Conscious of the time limitations and unaware of any other party acting on behalf of Nigeria against the forfeiture and to protect the interest of the Federal Republic of Nigeria and to make sure that the discovered looted funds were adequately protected in the litigation and repatriated back to Nigeria, plaintiff assembled a team of lawyers who quickly prepared and filed the necessary legal documents to intervene and make the

needed claims in the United States Federal District Court in order to preserve the interest of the Federal Republic of Nigeria in the safe return and repatriation of the discovered looted funds. Additionally, a claim was also filed on plaintiff's behalf to protect his right of fee and costs contest. Plaintiff dutifully made all these facts available to the then Attorney General of the Federal Republic of Nigeria, Mr. Mohammed Adoke. ( hereinafter "Adoke" ).

24.     After filing the pleadings with the U.S. Federal District Court in Washington D.C., plaintiff travelled to Nigeria where he provided copies of all documents filed in the District Court to the then Attorney General of the Federal Republic of Nigeria, Mr. Mohammed Adoke ("Mr. Adoke") and sought audience to meet and to brief him on the need and the necessity for the verification of the documents by Nigeria.

25.     On arrival to Nigeria, Plaintiff submitted all the necessary and relevant documents to Mr. Adoke. However, instead of meeting with plaintiff and extending the needed cooperation to the plaintiff for the efficient and effective accomplishment of the bargain with the Federal Republic of Nigeria and sign the mandatory "verification" of Claims and discuss how to protect the interest of the  Federal Republic of Nigeria and safely and expeditiously return the discovered looted funds back to Nigeria, Mr. Adoke delayed and waited until the time to perfect Nigeria's claim in the U. S. Federal District Court, D. C. Circuit expired. Thereafter, Mr. Adoke , in absolute bad faith and without cause, libeled plaintiff and caused a letter dated May 26, 2014, to be filed in the U.S. Federal District Court D.C. Circuit, misrepresenting and falsely claiming that plaintiff and the lawyers that he hired to accomplish the goals of his contract with Nigeria, had no authority to represent Nigeria. In the said letter, Mr. Adoke implied that Plaintiff's November 25,

2004 Letter of Instruction signed by the then Nigerian Attorney General, Chief Olujinmi, was not authentic or did not exist at all.

26.   Before, and as of, the date plaintiff filed the claims in the U.S. District Court in connection with the forfeiture action, Docket No. 1:13-cv-01832 (JDB), plaintiff had the authority to represent Nigeria and Adoke was fully aware of plaintiff's authority or he reasonably ought to be aware of it.

27.   In addition to writing and publishing the aforesaid libelous letter, Adoke also refused to sign or cause to be signed the mandatory "verification" required under the Law and which was necessary for plaintiff to perfect the Claims filed in the U.S Federal District Court, Washington D.C., to protect Nigeria's interest in the discovered looted funds.

28.   Based on Adoke's May 26, 2014 letter which the United States Attorney filed with the U.S. District Court and based on Mr. Adoke's unreasonable refusal to sign the "verification" required to perfect Nigeria's claim in a timely fashion, the District Court dismissed all pleadings filed by the plaintiff on behalf of Nigeria, including plaintiffs' claims for his fees and costs, as well as all the claims filed on behalf of Nigeria. Thereafter, on December 17, 2015 the Court entered a default Judgment against Nigeria in favor of the United States with respect to the discovered looted funds. Plaintiff immediately filed an appeal to preserve Nigeria's interest and to make sure that Nigeria does not lose those funds.

29.   Had Adoke met with plaintiff and signed the "verification" in a timely manner without writing the May 26, 2014 libelous letter, the Court would have forfeited the discovered funds directly to Nigeria and the funds would have been repatriated safely to

Nigeria, and plaintiffs fees, costs and expenses would have been decreed and paid thereby.

30.     As at the time Mr. Mohammed Adoke caused his said letter of May 26, 2014 to be filed in the U.S. Federal District Court in Washington D.C, plaintiff had discovered about five hundred and fifty million ($550,000,000.00) dollars of Nigeria's looted funds, had taken substantial steps and was still taking the reasonable and necessary steps to cause the safe repatriation of the discovered funds back to Nigerians.

31.     It is evidently clear and unquestionable that as at the time Mr. Mohammed Adoke wrote the letter of May 26, 2014, plaintiff had substantially performed and accomplished his own side of his bargain with the Federal Republic of Nigeria to merit the payment of his entire contingency agreement fee, of which 40% is considered reasonable by convention in this jurisdiction. As at the time Mr. Adoke wrote and submitted his letter of May 26, 2014, plaintiff had substantially completed his work per the 2004 retainer and plaintiff was still able, willing and ready to complete what remained to be done, if any. But the bad faith conduct of Mr. Mohammed Adoke, functioning as the Attorney General for Nigeria, prevented plaintiff from reaping the benefits of his 2004 bargain with Nigeria.

32.     The conduct of Mr. Mohammed Adoke, was extremely unreasonable, indefensible, in bad faith and it caused the plaintiff loss of reputation. It also caused him the loss of the fruits of his bargain with the Federal Republic of Nigeria, which is his contingency-agreement-fee of the forty percent (40%) of the $550 million dollars, the discovered looted sum of money, plus costs and the expenses plaintiff incurred thereby.

33.     Plaintiff's contingency-fee agreement in this case was entered into several years

before Mr. Adoke became the Attorney General of Nigeria. As at the time Mr. Adoke wrote and filed his letter of May 26, 2014, he was fully aware that the Plaintiff's contingency-fee Agreement with Nigeria was genuine, valid and unrevoked; fair and subsisting; effective and enforceable; and that it was still in existence and binding on the parties.

34.     In writing the letter of May 26, 2014, Mr. Adoke was acting with rapacity, with veiled intention and with ulterior motive. Mr. Adoke intended to corruptly chase plaintiff away from the recovery of the looted funds so that Mr. Adoke would "recover" and re-loot those funds for himself by himself or through his proxies and for his self enrichment and/or for his associates in crime. Today Mohammed Adoke appears to be a wanted man in Nigeria because of his dishonesty and criminal activities while serving as the Attorney General of Nigeria. Additionally, based on the conduct of the present Attorney General of Nigeria, Mr. Abubakar Malami, in relation to the recovery of the looted funds in this case, it reasonably appears that this Mr. Abubakar Malami, is astutely toeing the same parts of Mr. Adoke in this matter. Mr. Malami has also treated plaintiff with deliberate dishonesty, with greed and with ulterior motive. Mr. Abubakar Malami has painfully sabotaged plaintiff's efforts, and he has visibly and outrageously worked against the interest of the Federal Republic of Nigeria in the recovery and in the safe and in the timely repatriation of the looted funds in this case to Nigerians.

35.     Upon information and belief, prior to Mr. Adoke's appointment as the Attorney General of Nigeria, he worked for and represented the Abacha family and maintained a secret and "curious" relationship with the family and the other co-conspirators in the subject forfeiture action in the United States Federal District Court for the D.C. Circuit,

Docket Number 1:13-cv-01832 (JDB); and that worked against the interest of Nigeria, or

at the very least, provided a conflict of interest for his self enrichment. This also defines

the conduct of Mr. Abubakar Malami in the case, docket number 1:13-cv-01832 (JDB).

36.     Today, this Adoke has been noted as one of the most corrupt Attorneys' General

in the history of the Federal Republic of Nigeria. The Federal Republic of Nigeria has

even declared him wanted at the present time because of some of his dishonest, criminal,

dubious and fraudulent conducts while functioning as the Attorney General of Nigeria.

37.     Apart from initiating and causing the filing of his letter of May 26, 2014 in the

U.S. Federal District Court, District of Columbia, Mohammed Adoke also, callously and

without any reasonable cause whatsoever, referred plaintiff to the Nigerian Economic and

Financial Crimes Commission (EFCC) in a polluted attempt to threaten, intimidate and

harass plaintiff into a forceful abandonment of his retainer and his contingency-fee

agreement with Nigeria so that Mr. Adoke would take over the matter in the U.S. Federal

District Court and corruptly recover the money for himself by himself or through his

proxies.  Mr. Mohammed Adoke's corruption knows no bounds. Mr. Adoke was a very

fraudulent and dishonest Attorney General and he did not appear to act in the interest of

Nigeria in writing the letter of May 26, 2014. If any thing, Adoke was priming to steal

and re-loot the recovered looted funds.  Mr. Mohammed Adoke is presently a wanted

man in Nigeria because of his dishonest, criminal and fraudulent conducts while serving

as Nigeria's Attorney General.

38.     But when it became obvious to the plaintiff that Mr. Adoke was acting with

uttermost bad faith and not in the best interest of Nigeria, plaintiff made the intelligent

decision to look for the President Olusegun Obasanjo administration's Attorney

General, Chief Akinlolu Olujinmi, SAN, who signed and issued plaintiff with the initial

Retainer and Contingency-fee Agreement in 2004, on behalf of the Federal Republic of

Nigeria. Plaintiff located Chief Olujinmi and he authenticated and reaffirmed his initial

letter of 2004 regarding plaintiff's contract and contingency-fee agreement for the

recovery of the looted funds in issue. Mr. Adoke was fully aware of Chief Olujinmi's

authentication before he wrote his defamatory and libelous letter of May 26, 2014. Mr.

Abubakar Malami is also fully aware of these facts, but he deliberately chose to act

with rapacity, greed and against the interest of the Federal Republic of Nigeria.

39.     Mr. Mohammed Adoke did not act in good faith when he filed the aforesaid letter

of May 26, 2014. If he was acting in good faith, he would effortlessly have located the

2004 contingency-fee Agreement between plaintiff and the Federal Republic of Nigeria

in the documents contained in the files in his office as the Attorney General of Nigeria

because the existence of Nigeria as a nation did not stop with President Obasanjo's

administration, the administration that issued plaintiff with the 2004 retainer and

contingency-fee Agreement.

40.     It is noteworthy that after writing the letter of May 26, 2014 and depositing it

with the Court, Mr. Adoke did not positively do anything further to cause the repatriation

of the discovered looted funds back to Nigeria. His conduct only frustrated and prevented

the plaintiff's timely and transparent safe repatriation of the discovered looted funds to

Nigeria. Adoke's conduct was also designed, in large part, to support the efforts to re-

divert the discovered loot to his himself, his friend and associates, the Abacha family and

Abubarkar Bagudu, the alleged "criminal mastermind"[1] of the looted funds discovered in

---

[1] Some of the Court filings by the U.S. Government in the Court have variously described Abubakar Atiku
Bagudu as the "criminal mastermind" of the loots.

this matter. Plaintiff avers that trial evidence will show that the current Nigerian Attorney

General, Mr. Abubakar Malami, reasonably and convincingly appears to be working with

the same Abubakar Bagudu and the Abacha family in connection with the recovery of the

looted funds and with an intention similar to Adoke's. It will further be proved at trial

that Mr. Abubakar Malami has not been honest, he is burdened with conflict of interest

and he has not been strictly working in the best interest of the Federal Republic of

Nigeria in relation to the recovery of the looted funds involved in this case and in other

cases.

41.    That plaintiff's contract and his contingency-fee agreement with Nigeria was

issued to him in 2004 by a former Attorney General of Nigeria, Chief Akinlolu Olujinmi,

on behalf of the Federal Republic of Nigeria after a meeting between the plaintiff and the

then President of Nigeria in connection with looted funds. Chief Akinlolu Olujinmi was

the Attorney General from July 2003 to July 2005. Chief Olujinmi was succeeded by

three other Attorneys General before Mohammed Adoke[2].

42.    It is noteworthy that Mr. Adoke's letter of May 26, 2014 did not allege that

plaintiff's retainer and contingency-fee agreement was not properly issued in 2004 by the

Federal Republic of Nigeria through her then Attorney General, Chief Olujinmi, or that

the plaintiff's retainer and contingency-fee agreement with Nigeria had at any time been

revoked or was not properly in existence before and/or when Adoke filed his said bad

faith letter of May 26, 2014 with this U.S. Federal District Court in D.C. Additionally,

Mr. Adoke's aforesaid letter did not claim at all that plaintiff's 2004 retainer and

contingency-fee agreement with Nigeria had been canceled, withdrawn or revoked before

---

[2] See Nigerian Federal Ministry of Justice, available at http://www.justice.gov.ng/index.php/about-us/history/past-attorney-generals.

he filed his letter of May 26, 2014 with the U.S. Federal District Court. The said letter did not even contest Chief Akinlolu Olujinmi's authority and/or competence as the then Nigerian Attorney General in 2004 for issuing the retainer and contingency-fee agreement to the plaintiff. It is very obvious that Mr. Mohammed Adoke acted in bad faith, with ulterior motive and without any good cause in his letter of May 26, 2014.

43.     Plaintiff states that Mr. Adoke acted in bad faith and with ulterior motive solely for his selfish interest and that of his former Boss, the Abacha family and its criminal mastermind Abubarkar Atiku Bagudu. Plaintiff also states that Mr. Adoke and defendants acted without cause in this case when Adoke wrongfully discharged plaintiff after plaintiff had spent more than ten (10) years working for Nigeria on the 2004 retainer; and after plaintiff had substantially performed under the 2004 contract and was still ready, willing and able to accomplish the remainder, if any. Complainant states that he had earned his fees and should therefore be paid his contingency-fee agreement with the Federal Republic of Nigeria in the matter based on the percentage that is conventionally applicable in this jurisdiction.

44.     Plaintiff states that by Mr. Adoke's letter of May 26, 2014, he was discharged by the Federal Republic of Nigeria from the case without any notice and without cause. Plaintiff avers that since he had substantially performed his tasks before being terminated, he is entitled to receive the agreed contingency-fee agreement of the discovered looted funds.

45.     Plaintiff further avers that the conduct of defendants by Mr. Adoke's letter of May 26, 2014, was a veiled, dishonest and bad faith attempt to circumvent defendants' obligation to pay Attorneys' fees, costs and expenses in this matter for the more than ten

(10) years of work that plaintiff and the attorneys and the persons hired by him have been working on the 2004 contingency-fee agreement between plaintiff and the defendants.

46.     Prior to Mr. Adoke's letter of May 26, 2014, plaintiff avers that there has never been any person or administration or government in Nigeria that withdrew or attempted to withdraw the authority granted to the plaintiff by Attorney General Akinlolu Olujinmi in 2004; and there has been no person, government or administration in Nigeria that has ever compensated or paid any fees at all to the plaintiff or his attorneys or refunded any costs and/or any expenses incurred, from 2004 till date. The agreement that plaintiff had with defendants is that plaintiff would be paid and compensated from the moneys discovered and/or recovered. Plaintiff therefore states that he is entitled to 40% of the moneys involved in this matter or on quantum meruit.

47.     For approximately twelve (12) years, plaintiff and his attorneys have continued to work and provide services for and on behalf of Nigeria and at no time did the defendants revoke or cancel the retainer or the initial instruction given to plaintiff in 2004, until Mr. Adoke's bad faith letter of May 26, 2014. Plaintiff even filed an Appeal thereafter to protect his interest and to protect the funds for Nigerians.

48.     Plaintiff and his attorneys have substantially provided the services forming plaintiff's side of the bargain and plaintiff's obligations under plaintiff's 2004 retainership/ contingency-fee agreement with the Federal Republic of Nigeria. Additionally, plaintiff is still available, ready and willing to do further work, if any. Plaintiff therefore avers that he is duly entitled to his fees based the recovered funds or based on any recovery due to defendants Nigeria in Docket Number 1:13-cv-01832, U.S. Federal District Court in the D.C. Federal Circuit, as legal fees, costs and expenses for

the services that plaintiff has performed for the Federal Republic of Nigeria, pursuant to the 2004 retainer and contingency-fee agreement. Plaintiff respectfully states that it will be extremely unjust if this is not done because the Federal Republic of Nigeria will be unjustly and inequitably enriched.

49.     It is Common knowledge that during President Jonathan's regime, the ministers, most of the times, did whatever they liked and disrespected the President's orders and instructions; and that the ministers were neither properly trained nor adequately orientated for their positions by the Federal Republic of Nigeria. The ministers were also neither appropriately supervised nor controlled by the Federal Republic of Nigeria. Mohammed Bello Adoke was part of that administration and his conduct is the testimony.

50.     After the President Jonathan's political party (PDP) lost the 2015 presidential election to the now President Muhammed Buhari's political party (APC) in Nigeria, the second defendant, Mr. Abubakar Malami, became the new Attorney General of the Federal Republic of Nigeria and the replacement of Mr. Adoke. In November 2015, plaintiff did in fact approach defendant Malami and provided him with all documentation relevant with the subject matter of the suit, and in good faith, requested for an amicable resolution of his claims. Plaintiff also followed suit with numerous phone calls, emails and discussions, to be more fully set out and proved at trial.

51.     Plaintiff avers that in addition to providing documentations to defendant Malami, plaintiff's Attorneys and representatives, in Nigeria and in the United States of America, properly briefed Mr. Abubakar Malami personally on plaintiff's claim, and in good faith, requested him to undo the wrongs perpetrated by Mr. Adoke.

52.   Upon the review of the documentations, defendant Malami deceptively appeared to be acting in good faith and cooperative. Mr. Malami represented that he would resolve the matter and pay plaintiff's attorney's fees, costs and expenses; and he asked plaintiff not to file any suit. In reliance upon the representations made by Mr. Malami, plaintiff has refrained from filing a suit. Mr. Malami promised to sign the "verification" and letter setting aside Mr. Adoke's May 26, 2014 letter and that he would re-instate plaintiff's 2004 Letter of Instruction in the case.  Defendant Malami even went further and requested plaintiff's Attorneys to draft and provide him with the draft documents suitable for the said purpose for his signature.

53.   But instead of signing the documents as he had been representing, Mr. Abubakar Malami started making shocking proposals and demands before he would sign the documents. Mr. Abubakar Malami proposed that plaintiff should agree to part with and to pay a significant portion of his fees in the aforesaid matter to him as a condition for Malami to sign and deliver the necessary documents for the "verification" and the reactivation of the mandate letters to the plaintiff. Plaintiff understood Mr. Malami's proposal as demand for bribe and/or unlawful gratification in order to secure the signature of Mr. Malami on the "verification" and on the 2004 Mandate re-instatement. Plaintiff rejected Mr. Malami's proposal and demand because it was illegal and unethical.

54.   Plaintiff avers that the trial evidence will show that Plaintiff initially contacted Mr. Malami in November 2015. Mr. Malami continued to dribble plaintiff until March/April 2016 when he "appointed" and gave the case to a new attorney because plaintiff did not dance to Mr. Malami's tunes. Plaintiff further states that the new attorney later "retained" in the case by Mr. Malami had never been involved at all with the case;

knew nothing about case and had no prior history of any involvement with the Abacha

Loots case in the District of Columbia Federal Court or anywhere else in the world.

55.     The trial evidence will further show that Mr. Malami, continued to be

chameleonic and continued to act with dishonesty,  in bad faith and deceptively. The

evidence at trial will show that Mr. Abubakar Malami  adopted Mr. Adoke's deceptive,

despicable conducts and deliberate misrepresentations in this case; and that Mr. Malami

deliberately continued to make false and deceptive promises to plaintiff while working in

secret with the "criminal mastermind," Abubakar Bagudu. Plaintiff also avers that Mr.

Malami intends to recover the entire looted funds caused to be discovered by plaintiff

without paying any dime to plaintiff for his services, while at the same time assisting the

"criminal mastermind,"  Abubakar Bagudu, to frustrate U.S efforts and permit his

kinsman, Abubarkar Bagudu, to retain the loot or a significant portion thereof. Mr.

Malami's conduct in this matter is very disgraceful of the office of the Attorney

General's office of a nation like Nigeria; and in bad faith, unjust, very malicious and

unbecoming of any fair or civilized mind. The evidence and trial testimony will show that

Mr. Abubakar Malami acted with ulterior motives and that he deliberately and

detrimentally worked against the interest of the Federal Republic of Nigeria in this

matter.

56.     The trial evidence will further show that plaintiff would have filed this action very

soon after Mr. Adoke caused the filing of his libelous letter of May 26, 2014. However,

the defendants continued to deceive plaintiff with promises later discovered to be

deliberate falsehoods. When plaintiff intended to file a suit in January/February of 2015,

he was fed by the Presidency of the then Government in power with the promise that

defendants would resolve the matter immediately after the 2015 elections. However, when that Government in power lost to the present Buhari's Government, plaintiff also approached the present Government for a peaceful resolution of his claim. Plaintiff has continued discussing with the current Government of Nigeria until it has recently become obvious that its Attorney General, Abubakar Malami, has been acting deceptively and in bad faith.

57. Further, upon information and belief, second defendant Malami, was also an employee of the Abacha family and maintains a secret business relationship with the family and with Abubakar Bagudu that either pose a serious conflict of interest problem or is out rightly inimical to the interest of the Federal Republic of Nigeria, on whose behalf the Plaintiff worked in this matter for so many years.

58. Furthermore, at all the times relevant to this complaint, second defendant, Malami, maintains an unholy filial relationship with Abubarkar Bagudu, the alleged "criminal mastermind" of the stolen and looted funds at bar. Plaintiff contacted Mr. Malami concerning this matter in November of 2015 and Malami continued to play a dishonest and deceptive hide and seek game with plaintiff. Attorney General Abubakar Malami's conduct in this case does not reasonably represent that of a man that is working in the interest of his nation, Nigeria. It evidences that Mr. Malami's interest is parallel to and in utter conflict with the interest of the Federal Republic of Nigeria and very similar to that of Mr. Mohammed Bello Adoke's.

59. Plaintiff believes, and the evidence will also show at trial that the "criminal mastermind" of the shameful and unconscionable stealing of Nigerians commonwealth at bar, Abubarkar Bagudu, and the Abacha family either directly or indirectly sponsored,

20

influenced or promoted the appointment of Adoke and/or Malami as Nigeria's Attorney

General(s) in order to impede, scuttle, frustrate the recovery of the several looted funds

and/or to impede plaintiff's efforts at the successful repatriation of the looted funds.

60.     Plaintiff avers that upon the departure of Adoke, plaintiff believes that the duo of

Abacha family and particularly the mastermind, Atiku Abubarkar Bagudu, now as the

Governor of Malami's hometown of Kebbi State, directly or indirectly promoted,

influenced and sponsored the nomination and appointment of second Defendant, Malami,

as the Attorney General of Nigeria with the same objective of impeding and scuttling the

return of their looted funds to Nigeria and payment of plaintiffs fees. Defendant

Malami's conduct in this matter is designed to prosper himself through the eventual

diversion of all or part of the stolen fortunes to his "next of kin",Abubarka Bagudu, at the

expense and detriment of plaintiff Nnaka and the good people of Nigeria. Attorney

General Abubakar Malami reasonably appears to be compromised in the recovery of the

looted funds for Nigeria, and his conflict of interest is abysmally obvious. Plaintiff has

suffered therefrom.

61.     Additionally, the trial evidence in this case will elaborately and abundantly show

that Attorney General Abubakar Malami worked intentionally and deliberately against

the interest of the Federal Republic of Nigeria in the recovery of the looted funds in this

case. The evidence will also eloquently show that like Mr. Mohammed Bello Adoke, Mr.

Abubakar Malami was lethargic in working with plaintiff for the quick, safe and timely

recovery, return and repatriation of the looted funds to the Federal Republic of Nigeria

and to Nigerians because plaintiff refused to share the attorney's fees in the case. The

trial evidence will also painfully show that because of his hidden animosity against

plaintiff for disagreeing to share his fees, Mr. Abubakar Malami deceptively, maliciously

and vindictively caused plaintiff's counsel to travel from the Commonwealth of

Massachusetts to Washington D.C. and back on or about April 1 and 2, 2016, a journey

of more than 16 hours. Thereafter, another person/attorney surfaced, after more than a

month later, brandishing a "letter of authority" dated March 24, 2016, from Mr.

Abubakar Malami to "recover" the looted funds and take over the case for which plaintiff

had been working on for more than ten (10) years.

62.     The trial evidence will question Mr. Malami's character, his honesty, veracity and

his believability of having issued the said "letter of authority" to the "new attorney" on

March 24, 2016, and the reasons why Mr. Malami deliberately and deceptively caused

plaintiff's counsel to travel to Washington D.C. on April 1, 2016, for a "meeting" in

relation to the recovery of the same funds. Mr. Malami has pathetically acted with

uttermost bad faith, vindictively, with ulterior motive and with sorry conflict of interest in

this case.

63.     Plaintiff therefore claims against defendants, jointly and severally, as follows:

**PLAINTIFF HEREBY CLAIMS AGAINST DEFENDANTS AS FOLLOWS:**

**A.     COUNT 1 - Unjust Enrichment.**

64.     Plaintiff re-alleges and re-avers all the factual allegations contained in paragraphs

1 through 63 herein-above, and incorporates them herein as forming part of this count.

65.     Defendants' conducts in this case give rise to the common law liability for unjust

enrichment.

66.     Plaintiff tirelessly worked to substantially accomplish the objectives of this 2004

retainer and agreement with defendants, and plaintiff is still ready, willing and able to

22

accomplish anything remaining, assuming that there is any other thing remaining as undone. However, plaintiff has not been compensated for his efforts, services and for the benefits conferred upon the defendants. Defendants have thereby been unjustly enriched.

67.     After being retained by the defendants, plaintiff tirelessly worked and took the necessary and positive steps and actions to accomplish the needed objectives of the retainer.

68.     Because of plaintiff's work and performance of his own side of the bargain, the sum of defendants' looted funds of $550 million dollars was discovered. Plaintiff spent his time and money to accomplish this objective. Plaintiff worked for the benefit of defendants and plaintiff's financial discovery of $550 million dollars is for the benefit of the defendants. Defendants have not provided any compensation to plaintiff and it will amount to unjust enrichment to allow defendants to benefit from the services of plaintiff without compensating plaintiff. Plaintiff had demanded for the payment of his fees but defendants have unreasonably refused to make any payment to or compensate the plaintiff.

69.     Plaintiff is entitled to compensation and for the full restitution of all amounts in which defendants have unjustly been enriched at plaintiff's expense. Plaintiff's entitlement and his contingency-fee agreement with defendants is 40% of the discovered amount of the looted funds made by plaintiff.

    **Wherefore,** plaintiff prays this Court to enter judgment in plaintiff's favor against defendants, jointly and severally, for unjust enrichment and award to plaintiff an amount equal to the forty (40%) per cent of the benefit conferred upon defendants, five hundred and fifty million ($550,000,000.00) million dollars, and for such additional equitable and

legal reliefs as appears just to the Court, but not limited to, plaintiff's legal fees, costs and expenses.

### B.    COUNT II – Quantum Meruit.

70.    Plaintiff re-avers and re-alleges all the factual allegations contained in paragraphs 1 through 69 herein-above, and incorporates them herein as forming part of this count.

71.    The plaintiff's 2004 contract and retainer agreement with defendants made plaintiff to spend his time and money and worked perilously and tirelessly to discover or caused to be discovered  about $550million of defendants' looted funds.

72.    Throughout the period, plaintiff provided his skills, time, money and services for the benefit of defendants. Defendants knowingly and voluntarily accepted plaintiff's services and defendants encouraged plaintiff's activities.

73.    It would be unfair and unjust to allow defendants to retain the benefits created by plaintiff's efforts without any compensation from defendants to the plaintiff.

74.    Plaintiff avers that upon the granting of the retainership to Plaintiff, Plaintiff and his associates took painstaking steps to trace the funds, collaborated with appropriate authorities for its protection and prepared all appropriate papers and filed with the court, which but for the bad faith and deceptive acts and for libelous letter authored by Mr. Mohammed Bello Adoke, the stolen $550million would have been safely repatriated back to Nigeria in complete fulfillment of Plaintiff's mandate. Plaintiff, therefore, avers that he has substantially accomplished his side of the bargain with defendants. Plaintiff is also ready, willing and able to accomplish the remaining, if any. Accordingly, plaintiff is entitled to recover in quantum meruit for the value of the skills and services he provided

to defendants, from at least November 2004 to May 26, 2014 and thereafter. Plaintiff is entitled to his fees from the defendants and/or from the recovery due to the Federal Republic of Nigeria in the discovered looted sum since plaintiff had substantially accomplished the objectives of his bargain with defendants.

**Wherefore**, plaintiff asks the court to enter judgment in plaintiff's favor against defendants in quantum meruit and award the plaintiff his fees in an amount equal to what is conventionally applicable in this jurisdiction or the 40% of the value of the benefits skills and services conferred upon defendants by the plaintiff, and for such further and additional equitable and legal reliefs as appears just, fair and appropriate to the Court including, but not limited to, plaintiff's legal fees and costs in the present action.

## C.    COUNT III -  BREACH OF CONTRACT

75. The allegations contained in paragraphs 1 through 74 are herewith re-alleged and incorporated into this count as if fully set forth herein.

76.    Plaintiff avers that he entered into a lawful and binding contract with defendants and/or the Federal Republic of Nigeria. Plaintiff has fully and/or substantially performed his own side of the bargain. However, defendants have breached the contract and plaintiff has suffered damages.

77.     Plaintiff states that that the November 25th, 2004 Retainership agreement and letter signed by Chief Olujinmi constituted an enforceable agreement and contract between plaintiff and the Federal Republic of Nigeria which was accepted by the Plaintiff expressly and through performance.

78.    Plaintiff performed on the contract by tracing or causing to be traced and the discovery of the looted funds, and thereafter prepared and filed court pleadings seeking

for the repatriation of the discovered funds back to the defendants. Plaintiff took copies of all the pleadings filed in court and travelled to Nigeria and sought audience with Mr. Adoke, who was the then chief law officer for Nigeria and was acting on behalf of Nigeria, and a request for him to sign the "verification " to enable Plaintiff perfect Nigeria's claim.

79.     Adoke received the pleadings, deceptively gave and cancelled numerous appointments with the Plaintiff, causing Plaintiff to spend nearly one month waiting for him in Nigeria. Thereafter, without disclosing to the Plaintiff, and as Plaintiff was still in Nigeria waiting for Adoke to meet with him, Adoke secretly sent a letter to the United States Attorney misrepresenting that Plaintiff and the attorneys he engaged to work with him had "no authority" to make a claim on behalf of the Defendant Nigeria on the recovery of the looted funds.

80.     Plaintiff complained to the then Nigerian President who ordered and/or directed Mr. Adoke to sign and deliver to Plaintiff the "verification." However, in spite of the President's directive, Adoke failed and still refused to sign the said "verification."

81.     Defendant Nigeria, through the actions or omissions of its then Attorney General, Mr. Mohammed Bello Adoke breached the contract by failing to sign or refusing lawful directive to sign the "verification" which was necessary for Plaintiff to perfect Nigeria's claim in Court. But Adoke and the defendants knew that plaintiff had the authority based on the 2004 Retainer and the Contingency-fee Agreement.

82.     Mr. Adoke's letter and the absence of a signed verification caused the Court to dismiss both Plaintiffs claim for fees and Nigeria's claim for the return of the discovered loot in the case at the U.S. Federal District Court in Washington D.C., docket number

1:13-cv-01832 (JDB).

83.     Defendant Nigeria further breached the contract through the actions and inactions of second defendant Malami when he failed or unreasonably delayed in remedying the infractions of Adoke, after Plaintiff granted him numerous opportunities.

84.     The failures, refusal or unreasonable delays by Adoke and/or Malami as set forth in this Complaint constituted a breach of the contract and Plaintiff suffered damages as a result of the breach.

85.     Defendant Nigeria is liable, and also, for the official actions, commissions or omission of its officials.

     **Wherefore,** Plaintiff demands for judgment against defendants, jointly and severally, and prays that he is entitled to recover his damages in the amount equivalent to his contingency-fee agreement with the Federal Republic of Nigeria or as it is conventionally applicable in this jurisdiction, plus costs, fees and expenses as the Court deems fit and proper.

**D.     COUNT IV -   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

86.     Plaintiff re-avers and re-alleges all the allegations of facts contained in paragraphs 1 through 84 herein-above and incorporates them herein as forming part of this count.

87.     Plaintiff's Agreement with defendants, like every other binding Agreement, embodies an implied covenant by the parties to deal with each other fairly and in good faith and to desist from engaging in any act or behavior that would deprive the other from reaping the benefits of his/her bargain.

88.     Defendants Abubakar Malami and the Federal Republic of Nigeria acted with deception, in uttermost bad faith, underhandedly and maliciously in their relationship

with plaintiff in this case. The then Attorney General for Nigeria, Mr. Adoke deceptively kept Plaintiff waiting in Nigeria for nearly one month when plaintiff went to Nigeria to obtain the signed "verification." Adoke heartlessly and callously left plaintiff in Nigeria and traveled to the U.S. and caused the filing of his false, libelous and defamatory letter of May 26, 2014 with the U.S. Federal District Court, D.C.

89.     By defendants' letter of May 26, 2014 which defendants filed and/or caused to be filed in the Court in the United States District Court for the Washington D.C. Circuit, Docket No. 1:13-cv-01832-JDB, defendants acted in bad faith, with malice and defendants breached their covenant of good faith and fair dealing in their 2004 retainer, contract and contingency-fee agreement with the plaintiff.

90.     Defendants breach of the covenant of good faith and fair dealing has, till date, prevented plaintiff from reaping the fruits of his bargain from the aforesaid 2004 agreement between plaintiff and defendants. Plaintiff has been damaged thereby.

        **Wherefore**, plaintiff claims against defendants damages in the amount of **double or triple the 40%** of his contingency-fee agreement and retainer with defendants of the discovered looted sum, plus expenses, costs, attorneys' fees and any other awards that the Court may deem fit and necessary based on the defendants' conducts in this case.

## E.     COUNT V - MISREPRESENTATION AND DECEIT.

91.     Plaintiff re-alleges all the factual allegations contained in paragraphs 1 through 90 in this Complaint, and incorporates them herein as forming part of this count.

92.     Plaintiff avers that the facts concerning the plaintiff's 2004 retainer and contingency-fee agreement with the Federal Republic of Nigeria and the authority of the plaintiff to represent defendant Nigeria were very material facts as at the time defendants

wrote and presented the May 26, 2014 letter to the U.S. Federal District Court, D.C.  Mr. Adoke was an agent of Nigeria that was representing Nigeria as at the time he wrote and presented the aforesaid letter of May 26, 2014. The said letter was written and/or presented without any reasonable ground for believing it to be true. Defendants wrote the May 26, 2014 letter with the intent to induce another's reliance on the facts misrepresented.

93.     Plaintiff avers that there was justifiable reliance by the Court (U.S. Federal District Court, D.C. Circuit) on defendants' misrepresentations in their May 26, 2014 Letter, and that resulted in damages to plaintiff. Plaintiff's appearance and participation in the case and that of the attorneys retained by plaintiff in the case were terminated by the Court because of defendants' misrepresentations. Plaintiff has, as a result of defendants' conducts been damages and plaintiff has not been compensated for his services till date.

94.     Plaintiff wonders how a country that prides itself with fighting corruption has chosen to make a mockery of herself by conducting herself in a manner that evidences that she cannot in honesty and in good faith pay the lawyers retained by her in its so-called fight against corruption, as the evidence has clearly showed in this case.

**Wherefore,** plaintiff demands for judgment against defendants and claims against the defendants, jointly and severally, an amount double the 40% agreed contingency-fee agreement between plaintiff and the defendants. Plaintiff also requests for attorneys' fees, costs and all the expenses incurred in the prosecution of this suit together with other reliefs that the Court may deem fit and necessary.

F.    COUNT V1 -    LIBEL.

95.    Plaintiff re-alleges and re-avers all and every factual allegation contained in

paragraphs 1 through 94 of this Complaint and incorporates them herein as forming part

of this count.

96.    By his letter of May 26, 2014, defendants, through Mr. Mohammed Adoke,

intended to hold plaintiff up to scorn, hatred, contempt or ridicule in the minds of any

considerable and respectable segment in the community. Through the said letter by Mr.

Adoke, defendants held plaintiff up as an imposter, a rogue, a liar, a busy body, an

interloper, a dishonest person, a fraudster and as someone engaging in a criminal

conduct.

97.    The publication that defendants and Mr. Adoke made about plaintiff that plaintiff

had " no authority" to represent Nigeria was defamatory and libelous of plaintiff. The

defendants' statement that plaintiff had no authority to represent Nigeria was a materially

false statement of fact.

98.    Defendants and Mr. Adoke acted with malice and in bad faith and plaintiff was

damaged thereby.  As a result of their conducts, plaintiff's representation was struck and

he was defaulted by the Court. Plaintiff suffered damages as a result of the defendants'

defamatory and libelous publication.

     **Wherefore**, plaintiff demands for judgment against defendants in the amount of

one hundred million ($100,000,000.00) dollars, and for an apology from the defendants

to be published daily for two weeks in ten (10)  U.S. Newspapers and in ten (10) Nigerian

Newspapers, with national circulations. Plaintiff also demands for costs, expenses and the

attorneys' fees incurred in the prosecution of this case, and for an injunction preventing

defendants, their agents and assigns from any further publication of any libelous or defamatory materials about or concerning plaintiff.

## G.    COUNT V11 -  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99.    Plaintiff re-states the allegations contained in paragraphs 1 through 98 as if fully re-written herein.

100.    Adoke willfully and recklessly wrote and published a letter to the United States Attorneys and to the public falsely alleging that plaintiff Nnaka had "no authority" to act on behalf of Nigeria in preparing and filing the "intervention" and claim in the U.S District Court for the benefit of Nigeria based on plaintiff's 2004 Retainer and Contingency-fee Agreement with defendants. Believing Adokes letter to be true, the Court struck out plaintiff's claims.

101.    Unsatisfied with the gravity of such letter, Adoke went even further and wrote yet another letter to the Nigerian Economic and Financial Crimes Commission (EFCC) falsely alleging that plaintiff forged his November 25, 2004 retainership agreement which he used as his "authority " to intervene on behalf of Nigeria. Again, on the basis of Adokes letter, the Nigerian Economic and Financial Crimes Commission harassed plaintiff and "invited" the plaintiff for "interview".

102.    In writing and publishing the letters, Adoke knew or should have known that plaintiff's November 25, 2004 Retainer was genuine, authentic, valid and was not "forged." He had all the resources to obtain a copy in his office or reach out to his former colleague, Chief Olujinmi, who signed the letter for authentication. Defendants could also have met with the plaintiff who sought numerous audiences with them, for clarification. Driven by "evil passion" for greed, selfishness and corruptive mind, Mr.

Adoke ignored common sense and reason and wrote and published the aforesaid letters in an orgy of rage calculated to malign, threaten, intimidate, harass, harm and oppress the plaintiff.

103.    As a result of Adokes letters, plaintiff suffered and continue to suffer severe anxiety disorder, digestive disorder associated with extreme stress, mental anguish, aggravations, persistent irritable impulses, vomiting, sleepless nights, persistent and re-occurring bad dreams and severe emotional distress, among other sufferings.

104.    Adokes conducts were intentional, methodical and directed at the plaintiff with such recklessness and atrociousness that is intolerable and offensive to all notions of justice.

105.    By defendants' and Adoke's conducts, defendants intended to inflict emotional distress on the plaintiff or they knew or should have known that emotional distress was the likely result of their conduct. Defendants' conducts were extreme and outrageous and were beyond all possible bounds of decency and were utterly intolerable in a civilized community. The actions of the defendants were the cause of plaintiff's distress; and the emotional distress sustained by the plaintiff were severe and of the nature that no reasonable man could be expected to endure.

106.    Plaintiff suffered severe emotional distress from the outrageous conducts of the Defendants. Plaintiff is entitled to judgment against the defendants for his injuries.

**Wherefore**, Plaintiff demands for judgment and for damages against the defendants, jointly and severally, in the amount provable at trial and/or in the amount conventionally equivalent to his contingency-fee earning in the discovered loot, plus prejudgment interests, court costs, attorney fees and treble sum as exemplary damages

and any other relief the court deem fair and just.

**H. Count VIII - WRONGFUL DISCHARGE**

107. Plaintiff reiterates, restate and incorporate by reference the allegations contained in paragraphs 1 through 106 as if fully set forth herein in this count.

108. Plaintiff avers and alleges that at all times relevant to this complaint, Adoke and defendant Malami, were/are officials and agents representing Defendant Nigeria and acting within the scopes of their relationships and capacities. Plaintiff is further informed, believes and thereon alleges that each of defendants here gave consent to, authorized and/or ratified the acts alleged herein.

109. Plaintiff avers that he was employed on or about November 25, 2004 by Defendant Nigeria to use his professional services to search, investigate, trace, locate, recover and find or cause to investigate, trace, locate and find funds/ assets stolen or looted by former Nigerian officials and kept in foreign accounts/ foreign countries, and upon such discovery, to safely repatriate or cause the safe return or repatriation of the stolen/looted funds back to Nigeria.

110. That through the period described herein, plaintiff and his associates engaged in the provision of the aforesaid services with every amount of diligence, seriousness and professionalism.

111. Through the years and until the date of his wrongful termination in the case, plaintiff and his associates discovered or cause to be discovered a substantial amount of funds stolen or looted by Nigeria's former Head of State, General Sani Abacha and his business associates led by Abubakar Bagudu, in the amount of $550million and took substantial steps to cause its return or safe repatriation to Nigeria by filing a timely claim

on behalf of Nigeria in the United States Federal District Court., Case No 1:13-cv-01832 (JDB).

112. At all times relevant to this complaint, plaintiff retained and engaged the services of other attorneys in the herein-referenced U.S. District Court case to assist with the legal works on the quick return and safe repatriation of the discovered looted funds back to the good citizens of Nigeria.

113. But Defendants' official, Adoke, whose actions and conduct form part of this Complaint, it will be established at trial, had a secret relationship with the Abacha family and Abubakar Atiku Bagudu, an alleged looter in this case.

114. Additionally, Defendant Malami, the current Attorney General of Defendant Nigeria, it is believed also, has continuing business and filial relationship with the alleged "criminal mastermind" of the discovered looted funds, Abubakar Atiku Bagudu.

115. That after filing the claims to cause the return of the looted funds, plaintiff travelled to Nigeria, submitted relevant copies to Adoke, requested him to sign the "verification" to the claim and sought audience to discuss the claim with him.

116. Based upon information and belief, on the receipt of the documents, Adoke constituted an "internal committee" who reviewed the claims filed by plaintiff and recommended that Adoke sign the "verification" and meet with the plaintiff.

117. However, rather than sign the "verification" and meet with the plaintiff as internally recommended, Adoke through proxies proposed that plaintiff enter into a secret agreement to share plaintiff's fees to be paid to plaintiff by Nigeria with Adoke in exchange for Mr. Adoke's signing the "verification." Plaintiff at that time and on subsequent occasions, refused to engage in the act and rejected the proposal because it

was professionally unethical.

118. The actions Adoke proposed to plaintiff to engage in would have violated public policy, and in particular, the United States law prohibiting the giving of "bribes" to foreign officials for commercial transaction, known as Racketeering, Influence peddling and Corrupt Organizations act, herein RICO ACT, 18 USC 1964; 42 US 1988. Furthermore, the bribing with fees would have implicated and work against the Rules of Professional Conduct and Ethics.

119. That upon the departure of Adoke and the resumption of defendant Malami as the Attorney General of Nigeria, plaintiff did in fact approach defendant Malami to sign the "verification" and validate plaintiffs 2004 retainership with Nigeria so that the discovered looted funds would be recovered. To plaintiff's greatest surprise and dismay, Malami made similar demands and unethical proposals as Adoke as more fully set forth in the paragraphs above. Again, plaintiff rejected the proposals.

120. As a proximate result of plaintiffs refusal and conduct specifically described in herein-above, Adoke refused to sign the "verification" and by a letter dated May 26, 2014 terminated plaintiffs recovery of the discovered looted funds in 1:13-cv-01832 (JDB).

121. In terminating plaintiffs employment by stating that plaintiff had "no authority" to act on behalf of Nigeria, when in fact plaintiff did, and threatening plaintiff with EFCC, Adoke was merely fanning flimsy excuses to cover up his insistence that plaintiff chose between violating public policy and the law and losing his retainership with Nigeria.

122. Likewise, as a proximate result of plaintiff's refusal and conduct as specifically described in this count, Defendant Malami also refused to sign the "verification" or to re-instate plaintiffs retainership with Nigeria in relation to the recovery and repatriation of

the discovered looted funds in 1:13-cv-01832 (JDB).

123.    By refusing to sign the "verification" or re-instating plaintiffs retainer with Nigeria in relation to the case, and by wrongfully terminating the same, Mr. Adoke and/or Mr. Malami acted with evil motives to justify their insistence that plaintiff violate public policy and the law and for plaintiff to choose between violating the law and the re-instatement of his retainership.

124.    Notwithstanding this knowledge, Adoke and Malami despicably subjected plaintiff to cruel, evil and unjust hardship in conscious disregard of his rights, maliciously terminating his retainership in the case, refusing to re-instate it, and subjecting him to public scorn and opprobrium. Defendants' conduct warrants assessment of punitive damages.

125.    As a direct result of defendants conduct, plaintiff has suffered harm, including lost earnings, re-imbursement of his costs and expenses, humiliation, embarrassment , mental anguish and intense aggravations.

    **Wherefore**, plaintiff prays the Court to enter an order directing the Defendants to re-instate his retainership and or enter judgment against the defendants for compensatory damages in the amount equivalent to forty (40%) percent of the discovered looted funds, plus re-imbursement of all expenses, costs and attorney fees, and also punitive damages in an amount sufficient to punish defendants and deter others from engaging in similar despicable and corrupt conducts.

## H.    COUNT IX – ABUSE OF PROCESS.

126.    Plaintiff re-avers and re-alleges all the factual allegations in paragraphs 1 through 125 of this Complaint and incorporates them herein as part of this count.

127.   Plaintiff avers that the letter of May 26, 2014, which the former Attorney General

for Nigeria, Mohammed Bello Adoke, wrote, filed and/or caused to be filed in the United

States District Court in D.C., Docket No. 1:13-cv-01832 (JDB), was an abuse of the

process of the Court. Mr. Adoke filed and/or caused that letter to be filed for an ulterior

motive or for an illegitimate purpose; and plaintiff was damaged as a result therefrom.

   **Wherefore**, plaintiff demands for judgment against the defendants in an amount

to be proved at trial, together with attorneys' fees, costs and the expenses incurred in the

prosecution of this action.

I.    **Count X - Equitable Relief : Appointment of Plaintiff Godson M.
      Nnaka and his Counsel, Benneth O. Amadi, as "Private Attorneys
      General"**

128. The allegations contained in paragraphs 1 through 127 are further re-

alleged and incorporated by reference as forming part of this count.

129.   Plaintiff avers that by perception and in real terms, the actions of the

Government and political leaders in Nigeria have placed the country in the

eyes of the world as one of the most corrupt nations on earth. As a case in

point, Nigeria was ranked the most corrupt nation in the world in the year

2000,   2nd most corrupt nation on earth in 2001,  3rd most corrupt nation in

the world in 2002 and just of recent, the 15th most corrupt nation in the

world, by Transparency International.

130.   That corruption in Nigeria is an institutional problem spanning across

generations and widespread in virtually all Nigerian Government Agencies

and institutions, including the position and office of the Attorney General and the Ministry of Justice of Nigeria.

131. That this corruption is entrenched, perpetrated and humanized by mainly the business and political elites in Nigeria, without regard to the devastating consequences to the people of Nigeria and indeed the world.

132. That as the direct consequences of the endemic corruption, the ordinary citizens of the country suffer from abject poverty, persistent decline in life expectancy and high rates of civil strife, extremism and political instability that has assumed a global dimension, which if not urgently addressed, will "stretch" across the Atlantic and pacific, causing security and other challenges to the United States in particular, and indeed, the world.

133. Upon information and belief, Nigerian Government officials and political leaders have stolen and looted over $400 billion from public treasuries over the past decades. The citizens of the country are seriously suffering at the present time. A good percentage of the population find it hard, if not impossible, to eat one good meal in a day.

134. That a very significant portion of the stolen public funds are traceable, discoverable and returnable to the people of Nigeria, if there is the existence of the political will and uncorrupted institutions, particularly the office of the Attorney General, the Ministry of Justice and the other Agencies charged

with investigation, discovery, recovery and enforcement of return of the looted funds.

135.  That the effectiveness and functionality of these institutions and their "operators" have immensely been compromised and rendered impotent by the depth and sheer magnitude of corruption in the system, inadequate resources and lack of the necessary "technical skills."

136.  That the situation is compounded by a political system that encourages the emergence, nomination and appointment of the Attorneys General and Minsters of justice, without regard to "merit", or even their record of concern or accomplishments in defending the cause and interest of the people of Nigeria, as demonstrated by the reported fraudulent activities of Nigeria's former Attorney General, Mr. Mohammed Bello Adoke, while he was in office; and that of the current Attorney General, Mr. Abubakar Malami, of which the plaintiff now seriously complains.

137.  The lack of capacity or the will to fight the scourge of corruption in Nigeria does not end with the executive branch of Government, it extends to some parts of the Judiciary, where justice is reported to be "awarded to the highest bidder" and most corruption cases remain open for decades without final adjudication, and even when there is adjudication, the punishments decreed by the courts are very often not commensurate with the magnitude

of the corruption and/or the devastations therefrom.

138.  That even when other Governments through "concern" and "sympathy" assist in the recovery and repatriation of the aforementioned stolen funds, corrupt Nigerian Government officials have done nothing to use them to alleviate the sufferings of the Nigerian people. On the contrary, instances of "re-stealing of the returned stolen funds," or "re-looting the recovered looted funds" and misuse of the said funds, abound.

139.  This apparent lack of will and capacity imposed by widespread corruption in the Nigerian system leaves large prosecutorial gaps and diminishes the natural sovereignty of the Nigerian nation to deal decisively with corruption in the interest of the people.

140.  That the full spectrum of the "Nigerian linked conspiratorial corruption web" as it affects the jurisdiction of the United States, falls squarely as an "organized criminal enterprise" contemplated in the enactment of the "racketeering influence peddling and corrupt organization act" of which the American system, institutions and citizens, and by extension Nigerian people are the real victims. See **Civil Rico (18 USC 1964); See also 42 USC 1988.**

141.  Upon information and belief, and notwithstanding the present USD 550 million Abacha Loot at bar, there is still a significant amount of funds

stolen and looted by Nigerian government officials, within the purview of the jurisdiction of the United States, which plaintiff may be caused to have access to based on the information and data of their where about, and which, is believed to be beyond the present reach of the compromised efforts of the defendants, the Nigerian Government and/or its corrupt officials.

142.   Given the "corruption cloud" that surrounds the Office of the Attorney General and Minister of Justice of the Federal Republic of Nigeria and the occupants of that office, certification, authorization or even permission from the office of Attorney general of Nigeria or any Nigerian Government official for that matter should no longer be required of any attorney who is genuinely pursuing an action to investigate, discover, repatriate public funds stolen or looted by any Nigerian Government official within the jurisdiction of the United States for public good.

143.   That plaintiff is well experienced, has been directly or indirectly damaged by the stealing and looting of public funds of his native Nigeria, has substantial knowledge of the process, skills and contacts for the investigation, discovery and safe repatriation of the aforesaid stolen funds and can muster the resources essential to bring any contemplated action to fruitful and positive completion.

144.   Plaintiff is competent, willing and eligible to undertake the aforesaid

task referenced herein as and in the capacity of "Private Attorney General".

**Wherefore,** Plaintiff prays this honorable Court for an equitable

Order appointing him, Godson M. Nnaka, and his Attorney, Benneth O.

Amadi, Esquire, as "Private Attorneys General" on behalf of Nigeria and

for the benefit and in the interest of Nigerians, or in the alternative, take

"Judicial Notice" of such Appointment.

### PRAYERS FOR RELIEF.

Plaintiff hereby prays for judgment against the defendants, jointly and severally,

on all the counts in plaintiff's Complaint and as contained and prayed in the counts

therein. Plaintiff also requests the Court to award any and further reliefs that the facts of

this case, the conducts of defendants and the circumstances of this case may warrant, in

the interest of fairness and justice.

**Plaintiff Demands for Jury Trial on all the Jury triable issues raised in
this Complaint.**

> Respectfully by the Plaintiff,
> Through his Attorneys,
>
> /s/ Benneth O. Amadi
> Benneth O. Amadi, Esquire ; D. C. Bar # MA0003
> BBO# 646232
> 204 Blossom Street Ext. Ste. A
> Lynn, MA 01901
> 781-581-5144 ph.
> 781-581-5145 fx.
> bamadilaw@comcast.net

Date: 7/4/16