# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GODSON M. NNAKA,

     Plaintiff,

     v.

FEDERAL REPUBLIC OF NIGERIA,
et al.,

     Defendants.

Civil Action No. 16-1400 (JDB)

## MEMORANDUM OPINION

Godson Nnaka, a U.S. citizen of Nigerian descent, alleges that he was retained in 2004 by the Nigerian government to recover proceeds of alleged Nigerian corruption stashed in the United States and around the world. In 2014, Nnaka and several associates attempted to file claims on Nigeria's behalf in an asset forfeiture proceeding brought by the United States before this Court. But Nigeria soon disclaimed Nnaka and his work, telling the U.S. government by letter that Nnaka and his team did not have the authority to represent Nigeria in that (or any other) asset forfeiture matter. Nnaka has now filed this ten-count complaint against Nigeria and its Attorney General, seeking hundreds of millions of dollars in damages and injunctive relief. Defendants have moved to dismiss, arguing that the Foreign Sovereign Immunities Act shields both defendants from suit, that Nnaka's suit is barred by the political question and act of state doctrines, and that his complaint fails to state a claim upon which relief can be granted. For the reasons explained below, the Court concludes that it has jurisdiction to entertain Nnaka's suit. But because some of his allegations run afoul of the act of state doctrine, while others fail to state a claim upon which relief can be granted, the Court will nonetheless dismiss his complaint in its entirety.

1

## BACKGROUND

Nnaka's complaint is founded primarily on two letters from two Nigerian Attorneys General.  The first is a 2004 "Letter of Instruction" sent to Nnaka from then-Nigerian Attorney General Akinlolu Olujinmi.   That letter provides:

> I refer to the recent meeting between your goodself and myself (Nnaka/Olujinmi) regarding funds looted from Nigeria part of which you assured me you have information is lying in some banks in the United States.   This letter is to instruct you to proceed in a professional manner to recover the funds on behalf of the country. Please note that Government will only pay for your professional services a percentage as may be agreed of any sums actually recovered by you.  In other words, no recovery no payment[.]  You are required to keep me fully informed of whatever progress you are making periodically from the moment you embark on the execution of this instruction.  As a first step you will need to inform us in which banks the funds have been discovered.

2004 Letter of Instruction [ECF No. 16-3] at 2.  According to the complaint, after having received these instructions, Nnaka began his investigation, which took him to Nigeria, England, France, Turkey, Austria, Switzerland, and Angola.  Compl. [ECF No. 1] ¶ 19.  He also took investigative steps in the United States, engaging several U.S.-based consultants, attorneys, and advisors.  Id.

Nnaka says these efforts paid off when he "discover[ed] about five hundred and fifty million ($550,000,000.00) dollars stolen, looted, and stashed outside Nigeria by a former head of the government of the Federal Republic of Nigeria, the late General Sani Abacha."  Id. ¶ 13. Perhaps not coincidentally, in early 2014 the U.S. government unsealed an asset forfeiture complaint that sought to forfeit "five corporate entities and more than $500 million in other assets involved in an international conspiracy to launder proceeds of corruption in Nigeria during the military regime of General Sani Abacha."  U.S. Asset Forfeiture Compl., Case No. 13-1832 (JDB) [ECF No. 1] (D.D.C.); see also Compl. ¶ 21.  Nnaka's complaint is ambiguous concerning the relationship between his alleged discovery and the filing of the United States' asset forfeiture case.

His complaint simply mentions the two events in succession. <u>See</u> Compl. ¶¶ 20, 21. His opposition, on the other hand, suggests that his discovery came first and the United States' case came "later." <u>See</u> Pl.'s Opp'n to Mot. to Dismiss [ECF No. 16] at 6–7. Indeed, Nnaka appears to suggest that his discovery may even have prompted the U.S. government's investigation. <u>See</u> <u>id.</u> at 3–4.

Regardless of the precise chronology, Nnaka alleges that he quickly assembled a team of attorneys—comprised of Jude Ezeala, Charles Lion Agwumezie, and Kenneth Nnaka—to file the "necessary legal documents" in the asset forfeiture matter and thereby obtain "the safe return and repatriation of the discovered looted funds." <u>See</u> Compl. ¶¶ 19(l), 23. Once those filings had been made, Nnaka traveled to Nigeria to seek a meeting with then-Attorney General Mohammed Adoke about how best to protect Nigeria's interest in the litigation. <u>Id.</u> ¶¶ 24, 25. But, Nnaka alleges, Adoke was more interested in enriching himself than in protecting Nigeria's interests. According to Nnaka, Adoke's proxies proposed a <u>quid pro quo</u>: Adoke would verify the claims that Nnaka's team had filed on Nigeria's behalf, but only if Nnaka would agree to share his attorney's fees. <u>Id.</u> ¶ 117. When Nnaka refused to share his fees, Adoke refused to timely verify the claims. <u>See</u> <u>id.</u> ¶¶ 27–29.

Moreover, in May 2014 Adoke sent the second letter at the heart of this case. That letter, addressed to the "Asset Forfeiture Money Laundering Section" of the U.S Department of Justice Criminal Division, provides as follows:

> I hereby state that the following individuals are not authorized to represent Nigeria in your civil forfeiture action . . . or in any other effort to recover the proceeds of Nigerian corruption in the United States of America: Jude Chukwuma Ezeala, Kenneth A. Nnaka, Godson Nnaka, Charles Lion Agwumezie.

May 2014 Letter to DOJ [ECF No. 16-3] at 7; <u>see</u> Compl. ¶ 25. The U.S. government then filed Adoke's letter with this Court in the asset forfeiture matter. <u>See</u> Compl. ¶ 28. On the U.S.

government's motion, the claims submitted by Nnaka and his team were struck from the record and, later, default judgment was entered for the United States as to some of the defendant assets. Id.; see also Oct. 28, 2016, Mem. Op. & Order, Case No. 13-1832 (JDB) [ECF No. 137] at 2–5 (D.D.C.) (providing background on the asset forfeiture case and Nnaka's attempted participation in it); see also United States v. All Assets Held, Case No. 16-5283 (D.C. Cir. filed Sept. 30, 2016) (encompassing Nnaka's appeals of several orders in the asset forfeiture case).

After Adoke left office, Nnaka sought redress from the new (and current) Nigerian Attorney General, Abubakar Malami. Initially, Malami was receptive, allegedly offering to resolve Nnaka's dispute so long as Nnaka did not file a lawsuit. Compl. ¶ 52. He also allegedly promised to verify the claims filed by Nnaka's team and make clear to the United States that Nnaka had authority to represent Nigeria, the May 2014 letter notwithstanding. Id. But it was not to be. Nnaka alleges that, like his predecessor, Malami demanded a bribe in exchange for verifying the claims and reinstating Nnaka's authority. Id. ¶ 53. Nnaka again refused to pay and, as a result, Malami appointed a new attorney to represent Nigeria's interests, both in the asset forfeiture proceeding and in this case. Id. ¶ 54. Nnaka believes that, in attempting to thwart his efforts at recovery, both Adoke and Malami have been trying to enrich themselves and are working as secret agents of Abubakar Atiku Bagudu, a figure who is important to the U.S. government's complaint in the asset forfeiture matter. See Compl. ¶¶ 34, 40, 55; see also U.S. Asset Forfeiture Compl. ¶ 1 (alleging that: "General Abacha, his son Mohammed Sani Abacha, their associate Abubakar Atiku Bagudu, and others embezzled, misappropriated, defrauded, and extorted hundreds of millions of dollars from the government of Nigeria and others.").

Out of other options, Nnaka has brought this action directly against Nigeria and its Attorney General, Abubakar Malami, in his official capacity. Compl. ¶¶ 1, 7–8. His complaint has ten

counts. The first nine are for unjust enrichment, quantum meruit, misrepresentation, libel, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, wrongful discharge, and abuse of process. Id. ¶ 1. Most counts seek damages of $220 million, which is 40% of the benefit that Nnaka believes he has conferred upon Nigeria. See, e.g., id. ¶ 69. His count for misrepresentation seeks double that amount, and his claim for breach of the implied covenant of good faith and fair dealing seeks double or triple it. Id. ¶¶ 90, 94. His claim for libel seeks an additional $100 million in damages. Id. ¶ 98. And, last but not least, Nnaka's tenth count seeks an order appointing Nnaka and his attorney as private attorneys general for Nigeria and investing them with responsibility for the repatriation of stolen assets. See id. ¶¶ 128–44. Nigeria and Malami have moved to dismiss. See Defs.' Mot. to Dismiss [ECF No. 13]. They contend: first, that they are immune from suit under the Foreign Sovereign Immunities Act; second, that Nnaka's claims are barred by the political question doctrine; third, that the claims are barred by the act of state doctrine; and finally, that his complaint fails to state a claim upon which relief can be granted. The Court will address these arguments in turn.

## LEGAL STANDARDS

Both Nigeria and Malami argue that the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq., provides them with immunity from Nnaka's suit. As a foreign sovereign, Nigeria is plainly eligible to make a claim for immunity under the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992) (internal quotation marks omitted). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. § 1604. For

Malami, however, the question of immunity is more complicated. Because FSIA's definition of a foreign state does not extend to the state's individual officers, Malami's immunity claim is not covered by the FSIA. See Samantar v. Yousuf, 560 U.S. 305, 314–15, 325–26 (2010); see also 28 U.S.C. § 1603(a),(b). To establish immunity from suit, individual officers must generally show that they are entitled to share in their state's immunity. See Yousuf v. Samantar, 699 F.3d 763, 769 (4th Cir. 2012) (noting that "all forms of individual immunity derive from the state"); see also id. at 774 ("[C]onduct-based immunity for a foreign official derives from the immunity of the State[.]").

As a basis for the Court's jurisdiction, Nnaka attempts to fit his suit within the FSIA's commercial activity and non-commercial tort exceptions.[1] See Compl. ¶¶ 3–4 (citing 28 U.S.C. § 1605(a)(2),(5)). Because defendants "'challenge[] only the legal sufficiency of [Nnaka's] jurisdictional allegations,'" the Court must "'take [those] factual allegations as true and determine whether they bring the case within' either of those two exceptions." De Csepel v. Republic of Hungary, 714 F.3d 591, 597 (D.C. Cir. 2013) (quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)); see also Defs.' Mot. to Dismiss at 10 (accepting Nnaka's allegations as true for purposes of analysis); Defs.' Reply [ECF No. 18] at 6 (stating that defendants' Rule 12(b) motion to dismiss "relies exclusively on [Nnaka's] own complaint" and should be decided "without requiring discovery"). When the jurisdictional inquiry overlaps with the merits of a plaintiff's claim, the plaintiff need not prove a winning claim on the merits merely to establish jurisdiction. Simon v. Republic of Hungary, 812 F.3d 127, 141 (D.C. Cir. 2016). "Rather, the plaintiff need only show that its claim is 'non-frivolous' at the jurisdictional stage,

---

[1] Nnaka does not appear to distinguish between Nigeria and Malami when addressing the Court's jurisdiction. See Pl.'s Opp'n to Mot. to Dismiss at 11–14.

and then must definitely prove its claim in order to prevail at the merits stage." Id. (citing Bell v. Hood, 327 U.S. 678, 682 (1946)).

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must presume the truth of a complaint's factual allegations, though it is "not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). The court then asks whether the facts alleged suffice "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). On a motion to dismiss, the court considers "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation marks omitted).

The parties here agree that the Court should consider the 2004 and 2014 letters discussed above, which Nnaka has submitted as attachments to his opposition. Defendants further move that the Court take judicial notice of records in the related asset forfeiture case, and of two orders disbarring Nnaka from the practice of law in Maryland and the District of Columbia. See Defs.' Mot. to Take Judicial Notice [ECF No. 14]. Nnaka opposes both those requests. See Pl.'s Opp'n to Mot. to Take Judicial Notice [ECF No. 15]. Under Federal Rule of Evidence 201(b), a court may generally take judicial notice of court records in related proceedings. Fain v. Islamic Republic of Iran, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing Booth v. Fletcher, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)); see also Fletcher v. Evening Star Newspaper Co., 133 F.2d 395, 395 (D.C. Cir. 1942) (per curiam). The Court sees little issue with taking judicial notice of the procedural dimensions of the related asset forfeiture case—not least because Nnaka discusses them throughout his complaint as well. But because the Court need not rely on records concerning

Nnaka's disbarment to resolve defendants' motion to dismiss, that aspect of defendants' motion to take judicial notice will be denied as moot.

Finally, Nnaka moves to strike defendants' replies in support of their motions to dismiss and to take judicial notice, on the ground that they were filed five days late. See Pl.'s Mot. to Strike [ECF No. 19]. Even if defendants' replies were late (and under the relevant rules, they were not), the Court would hesitate to strike briefs filed by a foreign sovereign for so small a misstep. See Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1551 n. 19 (D.C. Cir. 1987). The Court will thus consider defendants' replies, and Nnaka's motion to strike will be denied. So too will the Court deny his request for leave to file a surreply, see Pl.'s Mot. to Strike at 5–6, as he has not identified any arguments raised by defendants for the first time in their replies. See United States v. Sum of $70,990,605, 4 F. Supp. 3d 209, 215 (D.D.C. 2014).

## DISCUSSION

### A.  FSIA and Foreign Official Immunity

The Court begins with Nnaka's argument that his suit against Nigeria falls within the FSIA's commercial activity exception. That exception provides that a foreign state is not immune from suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Defendants contend that Nnaka's claims are barred right at the threshold because he has failed to allege the existence of any "commercial activity" that could fall within the commercial activity exception. See Defs.' Mot. to Dismiss at 9–11.

Although the FSIA leaves the term "commercial" largely undefined, see Weltover, 504 U.S. at 612, it specifies that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose," 28 U.S.C. § 1603(d). When determining whether activity qualifies as commercial, therefore, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Weltover, 504 U.S. at 614 (internal quotation marks omitted). Thus, a foreign government engages in commercial activity when it contracts to buy army boots or bullets, even though private actors do not need to supply armies. Id. at 614–15. Likewise, it does so when it hires consultants to advise on rural development, even though private actors do not need such advice, and even if the contract includes some auxiliary terms that only a foreign state could negotiate. See Practical Concepts, 811 F.2d at 1550–51.

Nnaka contends that his purported 2004 retention agreement with Nigeria is "commercial activity" within the meaning of the FSIA. See Pl.'s Opp'n to Mot. to Dismiss at 11–12. The Court agrees. As other cases have recognized, retaining an attorney is the type of activity by which private parties engage in commerce. See Embassy of Federal Republic of Nigeria v. Ugwuonye, 901 F. Supp. 2d 136, 141 (D.D.C. 2012); Reichler, Milton & Medel v. Republic of Liberia, 484 F. Supp. 2d 1, 2 (D.D.C. 2007). Defendants object that Nnaka has defined the nature of the activity too narrowly: the alleged retainer does not merely hire an attorney, but hires an attorney to repatriate proceeds of official corruption—a purely sovereign activity. See Defs.' Mot. to Dismiss at 10; Defs.' Reply at 12–17. But the D.C. Circuit has warned against defendants' strategy of

"describing the act in question as intertwined with its purpose [to] avoid the statutory preclusion." Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 167 (D.C. Cir. 1994). Defendants' argument invokes the purpose of the alleged retainer, essentially asking the Court to assess whether defendants' actions were aimed at "fulfilling uniquely sovereign objectives." Weltover, 504 U.S. at 614. But that is not the proper question. Because Nnaka has alleged the existence of a retainer agreement with Nigeria, he has alleged an instance of commercial activity within the meaning of the FSIA. [2]

The remaining question is whether Nnaka's suit is "based upon" that commercial activity, or upon an act performed in connection with that commercial activity, in one of the ways specified in the FSIA. See 28 U.S.C. § 1605(a)(2). A suit is based on "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Nelson, 507 U.S. at 357. The relevant inquiry does not require the Court to undertake an "exhaustive claim-by-claim, element-by-element analysis" of each of Nnaka's ten causes of action. OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 396 (2015). Instead, the Court is charged with identifying "the particular conduct that constitutes the gravamen of the suit." Id. Nnaka's rambling and repetitive complaint is not a model of clarity. Nonetheless, the complaint makes one claim loudly and clearly—that Nigeria wronged Nnaka and caused him great injury in 2014 when its then-Attorney General told the U.S. government by letter that Nnaka did not have authority to represent Nigeria in the U.S. government's pending asset forfeiture action. Nnaka's attack on the legality of that decision is the foundation for most of his claims and, therefore, also the gravamen of his suit.

---

[2] Nor can defendants defeat jurisdiction by asserting that Nnaka's purported retainer agreement is not a valid contract. See Defs.' Reply at 12. That argument goes properly to the merits of Nnaka's claims rather than to his jurisdictional allegations, which are non-frivolous. See Simon, 812 F.3d at 141.

Characterized in that way, Nnaka's suit falls within the commercial activity exception because it is based "upon an act outside the territory of the United States" that was performed "in connection with a commercial activity of the foreign state elsewhere" and "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The commercial activity, as noted above, is Nigeria's alleged retention of Nnaka in 2004. Once Nnaka had attempted to intervene in the asset forfeiture litigation on Nigeria's behalf, citing the alleged retention agreement, Nigeria performed "an act in connection with" the commercial activity by informing the U.S. government that Nnaka lacked the authority to do so. And that act—in the form of a letter to the U.S. government, subsequently filed in a U.S. court—had a direct effect in the United States.

"To be 'direct' within the meaning of the FSIA an effect need not be 'substantial' or 'foreseeable' so long as it is more than 'purely trivial' and it follows 'as an immediate consequence of the defendant's . . . activity.'" Princz v. Federal Republic of Germany, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quoting Weltover, 504 U.S. at 618). These principles have been applied by courts in various contexts. In contract cases where the contract is both entered and breached abroad, for example, the breach will generally only have a direct effect in the United States if the contract "establishes or necessarily contemplates the United States as a place of performance." Odhiambo v. Republic of Kenya, 764 F.3d 31, 40 (D.C. Cir. 2014). Although Nnaka's complaint includes a claim for breach of contract, it sounds substantially—maybe even primarily—in tort. "'[I]n tort, the analog to contract law's place of performance is the locus of the tort.'" Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1184 (D.C. Cir. 2013) (quoting Antares Aircraft, LP v. Federal Republic of Nigeria, 999 F.2d 33, 34 (2d Cir. 1993)).

A tort's locus "is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'" Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC,

813 F.3d 98, 109 (2d Cir. 2016) (quoting Restatement of Conflict of Laws § 377 (1934)).  Because most torts are not complete until the plaintiff suffers an injury, see id., the locus of the tort will usually be "the place where the injury occurred," Sosa v. Alvarez-Machain, 542 U.S. 692, 705 (2004). "[A] determination that a tort's locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—meaning that those actions caused a 'direct effect' (the plaintiff's injury) in this country." Atlantica Holdings, 813 F.3d at 109; see also Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 710 n.11 (9th Cir. 1992) (noting the "general rule that a direct effect occurs at the locus of the injury directly resulting from the sovereign defendant's wrongful acts" (internal quotation marks omitted)).  Such a finding will therefore "ordinarily be sufficient, if not invariably necessary, to confer FSIA jurisdiction." Atlantica Holdings, 813 F.3d at 109.

Taking Nnaka's allegations as true, his injury occurred (at the earliest) when Nigeria's 2014 letter was filed in the asset forfeiture matter pending before this Court, or (at the latest) when the Court struck the claims that Nnaka and his team had filed.  Thus, even though the letter was presumably drafted in Nigeria, because the United States was the place of Nnaka's injury, the United States is the locus of the associated torts.  See id. at 109–11 (locus of securities fraud was the United States, where the loss was sustained, not where the allegedly misleading materials were drafted); LaMontagne v. Craig, 817 F.2d 556, 577 (9th Cir. 1987) (per curiam) (locus of defamation was Hong Kong, where the allegedly defamatory letter was published and acted upon, not on the high seas, where it was drafted); Withers v. Riggs Nat'l Bank, 829 F.2d 37 (4th Cir. 1987) (per curiam) (nonprecedential) (locus of consumer protection tort was "Washington D.C., where the impact of the letter produced the injury").

This is not a case, moreover, where a plaintiff attempts to satisfy the direct effects test merely by relying on U.S. citizenship, see Bell Helicopter, 734 F.3d at 1186, or by moving to the United States after suffering a tort abroad, see Princz, 26 F.3d at 1173. Here, Nigeria's allegedly tortious conduct was its communication with the U.S. government about the authority of a U.S. citizen to speak on Nigeria's behalf in litigation pending before a U.S. district court. The 2014 letter was addressed to the U.S. Department of Justice Asset Forfeiture and Money Laundering Section. See May 2014 Letter. It specifically referred to the pending asset forfeiture litigation by case name and docket number. Id. And it specifically named those individuals, including Nnaka, who had attempted to file claims in that case on Nigeria's behalf, indicating that they were "not authorized to represent Nigeria." Id.; see Compl. ¶ 6 (Nnaka noting U.S. citizenship). All indications, therefore, are that Nigeria's 2014 letter was intended to precipitate the very events that allegedly caused Nnaka's injuries in the United States.[3] For all these reasons, then, the Court concludes that Nigeria's communications with the U.S. government concerning Nnaka's authority to represent Nigeria had a "direct effect" in the United States. Cf. Atlantica Holdings, 813 F.3d at 110–11 (relying on allegations that the allegedly tortious materials were "directed toward" the United States). Nnaka's suit against Nigeria therefore falls within the commercial activity exception and is subject to this Court's jurisdiction.

The Court need not consider whether Nnaka's suit against Nigeria also falls within the non-commercial tort exception to FSIA immunity. The non-commercial tort exception removes foreign-sovereign immunity for cases, "not otherwise encompassed" by the commercial activity

---

[3] That is not to say, however, that this Court's decision striking Nnaka's claims followed inexorably from the 2014 letter. See July 3, 2014, Mem. Op. & Order, Case No. 13-1832 (JDB) [ECF No. 54] at 13–14 (D.D.C.). It is only to distinguish this case from others where "some intervening event" or the action "of a third party" causes an indirect effect in the United States that the alleged tortfeasor did not foresee or intend. See Odhiambo, 764 F.3d at 208; Atlantica Holdings, 813 F.3d at 114. Here, Nigeria was well aware that, if its letter had any effect, the effect would occur in the United States.

exception, "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state." 28 U.S.C. § 1605(a)(5). Several of the claims that Nnaka has brought here—abuse of process, libel, and misrepresentation—are expressly excluded from the non-commercial tort exception's ambit. See id. § 1605(a)(5)(B). But that is of little consequence. Because Nnaka's suit against Nigeria is encompassed by the commercial activity exception, the non-commercial tort exception does not apply. And even though several of Nnaka's claims would be barred under the non-commercial tort exception, under D.C. Circuit precedent that "do[es] not limit" the claims that he can pursue through the commercial activity exception. See El-Hadad v. United Arab Emirates, 216 F.3d 29, 35 (D.C. Cir. 2000).

Against this backdrop, Nnaka's claims against Malami are subsumed by his claims against Nigeria and therefore have no independent effect. As the Supreme Court has explained, "some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest." Samantar, 560 U.S. at 325 (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985)). This is such an action. Nnaka is quite adamant that his suit is against Malami in his "official capacity" as Attorney General. See Compl. ¶ 8; Pl.'s Opp'n to Mot. to Dismiss at 1; see also Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 72 (D.D.C. 2013) ("The plaintiffs make clear, both in their Third Amended Complaint and in their briefing, that they are suing [the individual] defendants . . . in their official, as opposed to their personal, capacities."). "[T]o recover on a damages judgment in an official-capacity suit," a plaintiff "must look to the government entity itself." Graham, 473 U.S. at 166. Thus, even if Nnaka was to obtain his desired judgment (for hundreds of millions of dollars) against Malami in his official capacity, Nnaka would need to look to Nigeria in order to recover. That makes Nigeria

14

the "real party in interest."  See Odhiambo v. Republic of Kenya, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013), aff'd, 764 F.3d 31 (D.C. Cir. 2014).  That conclusion is reinforced by the structure of Nnaka's complaint, which ranges over more than a decade and contains allegations concerning the conduct of at least three different Nigerian Attorneys General, each acting on behalf of Nigeria in a different period.  Disentangling these allegations into those running against Nigeria and those running against the office of the Attorney General would be no easy task—to the extent it would be possible at all.  The far simpler approach, which also gives Nnaka the full benefit of every allegation in his complaint, is to treat all the allegations as running against Nigeria.  Nnaka's suit against Malami will therefore be treated as a suit against Nigeria.  And for the reasons explained above, Nnaka's suit against Nigeria is not barred by the FSIA.

## B.  Political Question Doctrine

Defendants half-heartedly argue that Nnaka's suit raises non-justiciable political questions and is thereby barred by the political question doctrine.  See Defs.' Mot. to Dismiss at 13.  The political question doctrine defeats federal jurisdiction "only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it." Hourani v. Mirtchev, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting Nixon v. United States, 506 U.S. 224, 228 (1993)).  Defendants provide little reason to believe the political question doctrine applies here.  This case involves common law contract, quasi-contract, and tort claims against a foreign sovereign—all of them governed by standards "that courts routinely employ."  Id.  And, unsurprisingly, defendants cite no constitutional text committing these issues to the political branches.  Indeed, it is more accurate to say that the political branches, through the FSIA, have

specifically committed such questions to the courts. See id. at 9. Thus, the political question doctrine imposes no bar to the Court's jurisdiction over Nnaka's suit.

## C. The Act of State Doctrine

Even though the Court has jurisdiction over Nnaka's suit, many of his specific claims run afoul of the act of state doctrine. See id. at 12 (act of state doctrine represents "a rule of judicial restraint in decisionmaking, not a jurisdictional limitation"). The act of state doctrine is a function of the "domestic separation of powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990) (internal quotation marks omitted). "The doctrine directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality . . . of official action by a foreign sovereign performed within its own territory." Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS, 163 F.3d 1363, 1367 (D.C. Cir. 1999) (citing W.S. Kirkpatrick, 493 U.S. at 406). When the doctrine applies, it serves as a "rule of decision" requiring that such official acts "shall be deemed valid" in the process of deciding a case. World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (quoting W.S. Kirkpatrick, 493 U.S. at 405, 409). But the doctrine only applies to "official" state action: that is, to "conduct that is by nature distinctly sovereign" and "cannot be undertaken by a private individual or entity." McKesson Corp. v. Islamic Republic of Iran, 672 F.3d 1066, 1073 (D.C. Cir. 2012). Purely commercial acts do not qualify. See de Csepel, 714 F.3d at 604.

Nnaka's complaint takes aim at two such possible acts of state. The first is Adoke's alleged 2014 decision to refer Nnaka to the Nigerian Economic and Financial Crimes Commission, which then "harassed" him and "invited" him for an "interview." See Compl. ¶¶ 37, 101. Nnaka

contends this act amounts to the intentional infliction of emotional distress. Id. ¶ 101. Whatever the merits of that contention, however, such a referral certainly amounts to an act of state that must be deemed valid in the process of deciding this case. See World Wide, 296 F.3d at 1165; cf. Heath v. Alabama, 474 U.S. 82, 93 (1985) ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."). The act of state doctrine therefore precludes this Court from asking the question that Nnaka wants answered: whether it was illegal for a sitting Nigerian Attorney General to refer a matter to another Nigerian state actor responsible for criminal law enforcement.

The second possible act of state is Nigeria's inter-governmental communication, in the form of a May 2014 letter from then-Nigerian Attorney General Adoke to the U.S. Department of Justice, stating that Nnaka and his team were "not authorized to represent Nigeria" in the asset forfeiture matter. See May 2014 Letter. Admittedly, there is some degree of tension inherent in treating this act, first, as one that can support jurisdiction under the commercial activity exception and second, as a distinctly sovereign act of state. But that tension is resolvable. In the FSIA analysis, Nigeria's communication with the U.S. government was treated as an act performed "in connection with a commercial activity of the foreign state," not as the commercial activity itself. See 28 U.S.C. § 1605(a)(2). That act, moreover, has well-accepted sovereign characteristics that implicate the act of state doctrine.

"When two governments deal directly with each other as governments," they act in a distinctly sovereign capacity—even when, as here, the subject matter of the conversation might have some connection to commercial activity. See Cicippio, 30 F.3d at 168. And even when it is not directed solely to another government, official speech that gives "voice to the foreign government speaking from within its own territory" may constitute an act of state. See Hourani,

796 F.3d at 13–14; see also id. at 11 (statement posted on the website of Kazakhstan's Embassy to the United States "with the active support of the Kazakh ambassador" is an act of state); Riggs, 163 F.3d at 1368 (letter representing a decree by the Brazilian Minister of Finance is an act of state). This case fits squarely within those precedents. The 2014 letter that is the gravamen of Nnaka's complaint is an official communication from the Nigerian government to the U.S. government, concerning Nnaka's authority to speak on behalf of the Nigerian state in an asset forfeiture case instituted by the U.S. government. As a distinctly sovereign act performed within Nigeria (even if it had effects elsewhere), the communication is subject to the act of state doctrine. Applying that doctrine here, in the process of deciding this case the Court will "deem valid" and lawful Nigeria's communication with the U.S. government concerning Nnaka's (lack of) authority. See World Wide, 296 F.3d at 1165.

Concluding otherwise would threaten to hinder or embarrass the executive branch in its conduct of foreign relations. See id. After receiving Adoke's May 2014 letter, the U.S. government filed it with the Court in the asset forfeiture case. See Ex. 1 to Aff. for Default, Case No. 13-1832 (JDB) [ECF No. 44-1] (D.D.C.); see also Compl. ¶ 28. If the Court concluded at Nnaka's insistence that the inter-governmental communication contained in the letter was unlawful, it would also be concluding that the Nigerian Attorney General had misled officers of the U.S. executive branch, and that those U.S. officers had mistakenly relied on the misrepresentation. "A United States court ought not lightly undertake a role in which it must issue a public pronouncement that a foreign government is untruthful about an issue of intergovernmental relations. Few exercises could be further outside the bounds of judicial competence, or more intrusive with respect to the conduct of foreign affairs." Hourani, 796 F.3d at 15 (quoting Abourezk v. Reagan, 785 F.2d 1043, 1071 n.4 (D.C. Cir. 1986) (Bork, J.,

dissenting)).   Because adjudicating the aspects of Nnaka's suit based on the 2014 communication between the United States and Nigeria would threaten to hinder the U.S. executive's conduct of foreign affairs, the Court will abstain from doing so on act of state grounds.   Cf. <u>United States v. All Assets Held</u>, 83 F. Supp. 3d 360, 371–72 (D.D.C. 2015) (concluding that the act of state doctrine did not weigh against the exercise of jurisdiction in the asset forfeiture case because the U.S. executive had already concluded that action was in the best interest of the United States).

Once Nigeria's communications with the U.S. government concerning Nnaka's authority are presumed to be valid, most of Nnaka's claims must be dismissed.   Almost all of Nnaka's claims ask the Court to declare those communications to be illegal under one label or another.   <u>See</u> Compl. ¶ 79 (breach of contract); <u>id.</u> ¶ 89 (breach of the implied duty of good faith and fair dealing); <u>id.</u> ¶ 92 (misrepresentation and deceit); <u>id.</u> ¶ 96 (libel); <u>id.</u> ¶ 100 (intentional infliction of emotional distress); <u>id.</u> ¶¶ 120–21 (wrongful discharge); <u>id.</u> ¶ 127 (abuse of process).   But the Court cannot pass upon the "legality or illegality" of those inter-governmental communications.   <u>See</u> <u>Riggs</u>, 163 F.3d at 1367.   Nor can it logically conclude that defendants were legally required to verify Nnaka's claims, notwithstanding Nigeria's earlier communications to the U.S. government, without impugning the legality of the communications themselves.   <u>See</u> Compl. ¶¶ 81, 83 (breach of contract); <u>id.</u> ¶ 88 (breach of the implied duty of good faith and fair dealing); <u>id.</u> ¶ 119 (wrongful discharge).   And needless to say, this Court has no authority to appoint Nnaka and his current counsel as private attorneys general for Nigeria.   <u>See id.</u> ¶¶ 128–44.

### D.  Remaining Common Law Claims

After dismissing all those claims aimed at Nigeria's communications with the U.S. government concerning Nnaka's lack of authority, what remains are Nnaka's claims for unjust enrichment and quantum meruit.   Courts exercising jurisdiction over state law claims under the

FSIA must apply the choice-of-law rules of the forum where they sit. <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835, 841 (D.C. Cir. 2009). Under District of Columbia law, when "'both parties have failed to prove foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum.'" <u>Oparaugo v. Watts</u>, 884 A.2d 63, 71 (D.C. 2005) (quoting <u>Rymer v. Pool</u>, 574 A.2d 283, 285 (D.C. 1990)). Here, no party—including Nigeria and its Attorney General—suggests that Nigerian law should apply to Nnaka's remaining common law claims. Instead, defendants acquiesce in the application of D.C.'s substantive law by citing it throughout their filings. Nnaka, for his part, also cites D.C. substantive law when discussing his unjust enrichment claim. <u>See</u> Pl.'s Opp'n to Mot. to Dismiss at 18.

On the quantum meruit claim, however, Nnaka cites a district court case applying New York law—presumably because he believes that "[i]n New York, [a] disbarred Attorney is entitled to compensation on quantum meruit basis for the services and reimbursement of expenses and costs incurred up to the time of disbarment." Pl.'s Opp'n to Mot. to Dismiss at 23; <u>see also</u> <u>id.</u> at 20 (citing <u>Fleming, Zulack & Williamson, LLP v. Dunbar</u>, 549 F. Supp. 2d 98 (D.D.C. 2008)). In support of his claim that New York law should apply, Nnaka states flatly that "in the Retainer, the parties envisaged that the laws of New York should be applicable." <u>Id.</u> at 23. Yet as defendants point out, the 2004 Letter of Instruction makes no such designation. <u>See</u> 2004 Letter of Instruction; <u>see also</u> Defs.' Reply at 21. Absent any additional support, then, Nnaka has failed to show why New York law should apply rather than that of the District of Columbia, especially given that the District applies its own law in the event of a "tie" between two jurisdictions. <u>See</u> <u>Stephen A. Goldberg Co. v. Remsen Partners, Ltd.</u>, 170 F.3d 191, 195 (D.C. Cir. 1999) (citing <u>Kaiser-Georgetown Comm. Health Plan, Inc. v. Stutsman</u>, 491 A.2d 502, 509 n.10 (D.C. 1985)). Hence,

the Court will apply D.C. law to Nnaka's remaining common law claims, as defendants suggest. See Defs.' Mot. to Dismiss at 15–16.

Turning now to the merits: in order for Nnaka to state a claim for unjust enrichment, he must allege that (1) he conferred a benefit on defendants, (2) they retained the benefit, and (3) under the circumstances, their retention of the benefit is unjust. UMC Dev., LLC v. District of Columbia, 120 A.3d 37, 47 n.31 (D.C. 2015). To the extent that Nnaka's claim for "quantum meruit" represents a separate cause of action, he must similarly allege that (1) he rendered valuable services, (2) for the defendants, (3) defendants accepted and enjoyed those services, and (4) he has reasonably notified defendants that, in performing such services, he expected to be paid. Id.

Nnaka's claims arise in the context of a contingency-fee agreement. If Nnaka was indeed retained by Nigeria, it was plainly on a contingency-fee basis. See Compl. ¶ 10. The 2004 letter of instruction could not be clearer: "Please note that Government will only pay for your professional services a percentage as may be agreed of any sums actually recovered by you. In other words, no recovery no payment[.]" 2004 Letter of Instruction. Like all contingency fee agreements, the letter of instruction thus imposes "substantial risk" upon the attorney, whose fees "depend not only on the merits of the case, but also on the client's continued zeal for the cause and his willingness to continue retaining the attorney." King & King, Chartered v. Harbert Int'l, Inc., 503 F.3d 153, 156 (D.C. Cir. 2007). Under District of Columbia law, a client has the authority to settle or withdraw a claim without the attorney's consent. Id. (citing Barnes v. Quigley, 49 A.2d 467, 468 (D.C. 1946)). The client may also discharge its attorney, with or without cause. Id.

An attorney who substantially performs his tasks before being terminated without cause may receive his agreed upon proportion of the client's recovery, and even an attorney who performed negligible services before being terminated may obtain some quantum meruit

21

compensation for his efforts. Id. at 156–57 (citing Kaushiva v. Hutter, 454 A.2d 1373, 1375 (D.C. 1983); In re Waller, 524 A.2d 748, 750 (D.C. 1987)).  However, "[t]hose cases that recognize a quantum meruit claim for a wrongly discharged attorney who had been retained under a contingency-fee agreement presuppose that the client recovered something on his claim or otherwise tangibly benefitted from the discharged lawyer's work." King & King, Chartered v. Harbert Int'l, Inc., 436 F. Supp. 2d 3, 14 (D.D.C. 2006), aff'd, 503 F.3d 153 (D.C. Cir. 2007). Thus, in order to state a claim for unjust enrichment or quantum meruit, Nnaka must allege that Nigeria has enjoyed and retained some recovery as a result of his efforts. See Berry Law PLLC v. Kraft Foods Grp., No. 13–0475 (RBW), 2013 WL 12061613, at *4 (D.D.C. Dec. 11, 2013) (citing Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 565–66 (D.C. Cir. 1999); King & King, 436 F. Supp. 2d at 16).

But that is not the case here.  Nnaka appears to suggest two ways that his efforts may have benefitted Nigeria.  First, upon becoming aware of the asset forfeiture case, Nnaka filed claims on Nigeria's behalf and presented those claims to then-Attorney General Adoke for verification. See Compl. ¶¶ 23–25, 74.  But Nigeria has not enjoyed or retained any benefit as a result of those services.  Quite the contrary.  The theory of Nnaka's case is essentially that defendants rejected the benefits he offered.  Had Adoke accepted the fruits of Nnaka's hard work and timely verified his claims, Nnaka contends, this Court "would have forfeited the discovered funds directly to Nigeria and the funds would have been repatriated safely to Nigeria." Id. ¶ 29; see also id. ¶ 74. Instead, however, Adoke allegedly squandered the opportunity, waiting until the time to perfect Nnaka's claims had expired and taking no further steps to repatriate the funds. See id. ¶¶ 25, 40. But like the plaintiffs in King & King, Nnaka must bear the risks inherent in a contingency-fee agreement—including that the client will decide to forgo the claim. See King & King, 503 F.3d

at 156–57.  Nigeria presents this case as one concerning its "discretion to engage counsel of its choosing" to assist with "the recovery of laundered proceeds of official corruption."  Defs.' Mot. to Dismiss at 13.  As the client, Nigeria decided not to pursue the claims that Nnaka had filed on its behalf.  "These are the kinds of difficult decisions a client must have the authority to make."  King & King, 503 F.3d at 157.  Having definitively forfeited Nnaka's claims, Nigeria has enjoyed no benefit or recovery in connection with them.  Nnaka's first allegation, therefore, will not support claims for unjust enrichment or quantum meruit.

Second, Nnaka alleges repeatedly that Nigeria has benefited from his "discovery" of looted Nigerian assets.  See, e.g., Compl. ¶ 13.  Nnaka does not base this allegation on many—perhaps not on any—specific facts, so it is challenging to determine what exactly the allegation means.  It seems clear enough, however, that the funds Nnaka allegedly "discovered" are the same funds at issue in the U.S. government's asset forfeiture action.  See Compl. ¶ 30 ("[P]laintiff had discovered about five hundred and fifty million ($550,000,000.00) dollars of Nigeria's looted funds, had taken substantial steps and was still taking the reasonable and necessary steps to cause the safe repatriation of the discovered funds back to Nigerians."); Pl.'s Opp'n to Mot. to Dismiss at 6 ("The United States later initiated a forfeiture action against the discovered loot . . . .").  If Nnaka's "discovery" was merely his becoming aware of the asset forfeiture case and filing claims on Nigeria's behalf, then his claims for unjust enrichment and quantum meruit must be dismissed.  As explained above, Nigeria has enjoyed no benefit or recovery as a result of those actions.  And because Nnaka was allegedly retained to "recover" looted Nigerian assets, not merely to "discover" them, see 2004 Letter of Instruction, Nnaka cannot claim that this "discovery" represented substantial performance under his alleged retainer agreement.

23

Perhaps, however, Nnaka means to allege that he located the assets and traced them to alleged Nigerian corruption, even before they had become the subject of the U.S. government's asset forfeiture case. But if that is so, Nnaka has not explained how his discovery benefitted Nigeria. Based on the allegations in Nnaka's complaint, nothing came of that alleged discovery until the U.S. government filed the asset forfeiture case. See Compl. ¶ 20. And that would seem to erect a barrier between Nnaka and his desired relief—the U.S. government, not Nnaka, would then be responsible for any assets that Nigeria ultimately recovered through the litigation. Grasping this difficulty, Nnaka attempts to argue that his investigation actually <u>caused</u> the U.S. government to file the asset forfeiture case.[4] In his opposition brief, he contends that defendants have "refused to accept the fact that plaintiff's associates and agents in the investigation and tracing were tied to the U.S. Intelligence and did or could have prompted" the asset forfeiture litigation. Pl.'s Opp'n to Mot. to Dismiss at 4; <u>see also id.</u> at 2 ("Defendants' claim that the loot was discovered by any other entity is ridiculously unsupportable and misleading."); <u>id.</u> at 19 (Nnaka's "investigation, tracing, field rapporteur, canvassing[,] and sourcing" is what "led to the discovery of the asset[s] at bar.").

Unfortunately for Nnaka, his complaint contains no allegations to support that contention. Because it "is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss," <u>Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.</u>, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quoting <u>Coleman v. Pension Benefit Guar. Corp.</u>, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)), the factual allegations cited above and contained solely in Nnaka's opposition are not properly before the Court. Also in his opposition, Nnaka attempts to adjust subtly the

---

[4] The U.S. government says otherwise. In a filing responding to one of Nnaka's many motions in the asset forfeiture case, the government represented that "Mr. Nnaka had no role in investigating or prosecuting the allegations set forth" in the asset forfeiture complaint. <u>See</u> United States' Opp'n to Godson Nnaka's Motion to Impose a Charging Lien of $320 Million Dollars, Case No. 13-1832 (JDB) [ECF No. 118] at 3 (D.D.C.).

allegations of his complaint so that his "discovery" precedes the U.S. government's asset forfeiture case.  <u>Compare</u> Compl. ¶ 21 ("[T]he United States initiated a forfeiture action against the discovered loot under seal in 2013 in the U.S. Federal District Court in the District of Columbia."), <u>with</u> Pl.'s Opp'n to Mot. to Dismiss at 6 ("The United States <u>later</u> initiated a forfeiture action against the discovered loot under seal in 2013 in the U.S. Federal District Court in the District of Columbia." (emphasis added)).  But the Court will not allow him to do so.  Without any specific factual allegations linking his investigation to the asset forfeiture case, Nnaka cannot claim the filing of the asset forfeiture litigation as a benefit that he has conferred upon Nigeria.

Even assuming, however, that the Court would consider and accept as true for present purposes the doubtful assertions made in Nnaka's opposition, they still do not help him state a claim.  Nnaka has not alleged what "identifiable, tangible benefit" Nigeria has obtained from the mere <u>filing</u> of the asset forfeiture case.  <u>See</u> <u>King & King</u>, 436 F. Supp. 2d at 14.  The records of the asset forfeiture case, judicially noticeable here, reveal that no recovery has yet been had by Nigeria.  And because Nnaka has failed to allege that his purported client, the Federal Republic of Nigeria, has enjoyed and retained some recovery as a result of his legal work, he fails to state a claim for unjust enrichment or quantum meruit.

## CONCLUSION

For the foregoing reasons, Nnaka's complaint must be dismissed.  A separate Order has issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>February 27, 2017</u>